```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3      Gilbert N. Faford, II,

 4                         Plaintiff,

 5      -v-                                  Case No. 19-10523

 6      Grand Trunk Western
        Railroad Company,
 7
                           Defendant.
 8      _____/

 9                           MOTION HEARING
                             April 12, 2021
10
                  BEFORE THE HONORABLE DAVID M. LAWSON
11                    United States District Judge

12             HEARING CONDUCTED VIA VIDEO CONFERENCE
                  ALL PARTIES APPEARING REMOTELY
13

14      APPEARANCES:

15      FOR THE PLAINTIFF:     ARVIN J. PEARLMAN
                               BENJAMIN J. WILENSKY
16                             Sommers Schwartz, P.C.
                               One Towne Square, Suite 1700
17                             Southfield, Michigan  48076

18      FOR THE DEFENDANT:     MARY C. O'DONNELL
                               Wise Carter Child & Caraway, P.A.
19                             28 West Adams Avenue, Suite 1700
                               Detroit, Michigan  48226
20                                and
                               CHARLES HENRY RUSSELL, III
21                             Wise Carter Child & Caraway, P.A.
                               401 East Capitol Street, Suite 600
22                             Jackson, Mississippi  39201

23

24             To Obtain a Certified Transcript Contact:
               Rene L. Twedt, CSR-2907, RDR, CRR, CRC
25                      www.transcriptorders.com
```

### TABLE OF CONTENTS

MATTER                                                               PAGE

PLAINTIFF'S MOTIONS IN LIMINE

TO PRECLUDE COLLATERAL SOURCE BENEFITS
Argument By Mr. Pearlman.................................... 7
Argument By Mr. Russell.................................... 8
Ruling By the Court....................................... 8
TO PRECLUDE NON-BACK-RELATED MEDICAL CONDITIONS
Argument By Mr. Pearlman.................................... 8
Argument By Mr. Russell.................................... 9
Further Argument By Mr. Pearlman.......................... 10
Ruling By the Court....................................... 10
TO PRECLUDE INTRODUCTION OF EMPLOYMENT APPLICATION
Argument By Mr. Pearlman.................................... 12
Argument By Mr. Russell.................................... 13
Ruling By the Court....................................... 14
TO PRECLUDE PHOTOS OF PLAINTIFF'S HOME AND WIFE'S INCOME
Argument By Mr. Pearlman.................................... 16
Argument By Mr. Russell.................................... 17
Ruling By the Court....................................... 18
TO PRECLUDE DEBIT AND CREDIT CARD RECORDS
Argument By Mr. Pearlman.................................... 19
Argument By Mr. Russell.................................... 20
Further Argument By Mr. Pearlman.......................... 21
Further Argument By Mr. Russell........................... 22
Ruling By the Court....................................... 22
TO PRECLUDE ARTICLES AND OPINIONS ON SECONDARY GAIN
Argument By Mr. Pearlman.................................... 23
Argument By Mr. Russell.................................... 24
Further Argument By Mr. Pearlman.......................... 26
Ruling By the Court....................................... 26
TO PRECLUDE LACK OF REPORTING WORKPLACE HAZARDS
Argument By Mr. Pearlman.................................... 28
Argument By Mr. Russell.................................... 30
Ruling By the Court....................................... 31
TO PRECLUDE BLAMING CO-WORKERS FOR WORKPLACE CONDITIONS
Argument By Mr. Pearlman.................................... 31
Argument By Mr. Russell.................................... 32
Ruling By the Court....................................... 33
TO PRECLUDE CO-WORKERS RESPONSIBILITY FOR UNSAFE CONDITIONS
Argument By Mr. Pearlman.................................... 33
Argument By Mr. Russell.................................... 34
Ruling By the Court....................................... 35
TO PRECLUDE SIMILAR INJURIES TO OTHER WORKERS
Argument By Mr. Pearlman.................................... 36
Ruling By the Court....................................... 37

 1  DEFENDANT'S MOTIONS IN LIMINE

 2  TO PRECLUDE REFERENCES TO WORKERS' COMPENSATION
    Argument By Mr. Russell.................................... 38
 3  Argument By Mr. Wilensky.................................. 39
    Ruling By the Court....................................... 39
 4  TO PRECLUDE REFERENCE TO PURPOSE OF FELA
    Argument By Mr. Russell.................................... 40
 5  Argument By Mr. Wilensky.................................. 41
    Ruling By the Court....................................... 41
 6  TO PRECLUDE REFERENCE TO PLAINTIFF'S CHARACTER
    Argument By Mr. Russell.................................... 42
 7  Argument By Mr. Wilensky.................................. 42
    Further Argument By Mr. Russell........................... 43
 8  Ruling By the Court....................................... 43
    TO PRECLUDE REFERENCE TO GRAND TRUNK'S FINANCIAL CONDITION
 9  Ruling By the Court Without Argument...................... 44
    TO PRECLUDE EVIDENCE OF FAMILY'S CIRCUMSTANCES
10  Argument By Mr. Russell.................................... 44
    Argument By Mr. Wilensky.................................. 45
11  Ruling By the Court....................................... 45
    TO PRECLUDE SUBSEQUENT REMEDIAL MEASURES
12  Argument By Mr. Russell.................................... 46
    Argument By Mr. Wilensky.................................. 47
13  Ruling By the Court....................................... 48
    TO PRECLUDE EVIDENCE OF SAFER METHODS OF WORK
14  Argument By Mr. Russell.................................... 49
    Argument By Mr. Wilensky.................................. 50
15  Further Argument By Mr. Russell........................... 51
    Ruling By the Court....................................... 52
16  TO PRECLUDE FORMAL INVESTIGATION OR DISCIPLINE
    Argument By Mr. Russell.................................... 53
17  Argument By Mr. Wilensky.................................. 54
    Further Argument By Mr. Russell........................... 56
18  Ruling By the Court....................................... 57
    TO PRECLUDE EVIDENCE OF NEWER AND SAFER TOOLS
19  Argument By Mr. Russell.................................... 59
    Argument By Mr. Wilensky.................................. 60
20  Ruling By the Court....................................... 62
    TO PRECLUDE GTW DUTIES CAUSING INJURY BEFORE FIRST INCIDENT
21  Ruling By the Court Without Argument...................... 63
    TO PRECLUDE EVIDENCE REGARDING BARRY HAMMOCK
22  Argument By Mr. Russell.................................... 63
    Argument By Mr. Wilensky.................................. 67
23  Further Argument By Mr. Russell........................... 69
    Ruling By the Court....................................... 70
24  TO PRECLUDE MENTION OF CANADIAN NATIONAL RAILWAY
    Argument By Mr. Russell.................................... 71
25  Argument By Mr. Wilensky.................................. 72
    Ruling By the Court....................................... 73

1   DEFENDANT'S MOTIONS IN LIMINE CONTINUED

2   TO PRECLUDE EVIDENCE OF LOSS OF CONSORTIUM
    Ruling By the Court Without Argument...................... 73
3   TO PRECLUDE EVIDENCE THAT BRIAN WEAVER
    WAS NOT ABLE TO CONDUCT INVESTIGATION
4   Ruling By the Court Without Argument...................... 74
    TO PRECLUDE EVIDENCE THAT JOB WAS
5   TIRING, EXHAUSTING OR REPETITIVE
    Argument By Mr. Russell.................................. 74
6   Ruling By the Court...................................... 75
    TO PRECLUDE GOLDEN RULE ARGUMENT OR REPTILE THEORY
7   Argument By Mr. Russell.................................. 76
    Argument By Mr. Pearlman................................ 78
8   Ruling By the Court...................................... 78
    TO PRECLUDE EVIDENCE OF FUTURE WAGE LOSS
9   Argument By Ms. O'Donnell............................... 80
    Ruling By the Court...................................... 85
10  MOTION FOR FACT FINDINGS AND INSTRUCTIONS FROM THE COURT
    Argument By Ms. O'Donnell............................... 86
11  Argument By Mr. Pearlman................................ 92
    Further Argument By Ms. O'Donnell....................... 98
12  Ruling By the Court..................................... 101
    to PRECLUDE LOSS OF VALUE OF HOUSEHOLD SERVICES
13  Ruling By the Court Without Argument.................... 103

14  CERTIFICATE OF COURT REPORTER........................... 109

15

16

17

18

19

20

21

22

23

24

25

 1  April 12, 2021

 2  10:06 a.m.

 3                      *      *      *

 4          THE COURT:  We will call this session of Court to

 5  order.  This is a session of the United States District Court

 6  for the Eastern District of Michigan, being conducted via video

 7  teleconferencing technology because the proceedings cannot be

 8  conducted in person without serious harm to public health and

 9  safety.

10          This is a session to address six motions in limine

11  filed by the parties in anticipation of an upcoming trial

12  in the case of Faford versus Grand Trunk Railroad,

13  Case Number 19-10523.

14          May I have appearances for the plaintiff, please,

15  starting with Mr. Pearlman?

16          MR. PEARLMAN:  Yes, your Honor.  Arvin Pearlman, one

17  of the attorneys appearing on behalf of plaintiff, Gilbert N.

18  Faford, II.

19          MR. WILENSKY:  Good morning, your Honor.  Benjamin

20  Wilensky also for the plaintiff, Mr. Faford.

21          THE COURT:  Is your client present?

22          MR. PEARLMAN:  He will be present, I believe at 10:30,

23  your Honor.

24          THE COURT:  Okay.  Thank you.  He is not in your

25  office?  He'll be joining from elsewhere?

```
 1              MR. PEARLMAN:  He'll be joining us remotely.
 2              THE COURT:  Thank you.
 3              May I have appearances for the defendant, please,
 4    starting with Mr. Russell?
 5              MR. RUSSELL:  Yes, your Honor.  This is Charlie
 6    Russell for the defendant, Grand Trunk Western Railroad
 7    Company.
 8              MS. O'DONNELL:  And Mary O'Donnell on behalf of
 9    defendant, Grand Trunk Western Railroad Company.
10              THE COURT:  All right.  We have several motions
11    in limine and they are -- they cover a variety of areas of
12    evidence.
13              I would like to spend an efficient amount of time on
14    them, so I'm thinking that maybe I'll permit argument of about
15    five minutes on each point.
16              We will begin with the plaintiff's motion in limine
17    which is Docket Number 109, in which the plaintiff identifies
18    10 items of evidence that it wishes to preclude the defendant
19    from offering at trial.
20              The first has to do with Railroad Retirement Board
21    benefits.
22              And who is taking this motion?
23              MR. PEARLMAN:  Your Honor, Arvin Pearlman, for the
24    record.  I will be -- for your information, I will be arguing
25    the 10 points on plaintiff's motions in limine.
```

1          Mr. Wilensky will be responding to the defendant's

2     first motion, which I think contains 15 points.

3          I will argue the second motion, and the fourth and

4     fifth motions by the defendants, and Mr. Wilensky will argue

5     the third motion.

6          THE COURT:  Go ahead and address your first point,

7     Mr. Pearlman.

8          MR. PEARLMAN:  Thank you, your Honor.

9          The first motion that we filed was to preclude

10    evidence of plaintiff's receipt of collateral source benefits.

11         Mr. Faford, as a railroad employee, was entitled to

12    receive sick benefits from the Railroad Retirement Board, which

13    he did for a limited period of time.  The thrust of our motion

14    is simply based on Eichel versus New York Central Railroad

15    Company at 375 U.S. 253 where the United States Supreme Court

16    basically held that the payments of railroad retirement

17    benefits were inadmissible as a collateral source.

18         THE COURT:  All right.  Thank you.  I think I

19    understand your position.

20         And just so we can move this record along for the

21    court reporter, Eichel is E-i-c-h-e-l.

22         Who is responding to this motion?

23         MR. RUSSELL:  I am, your Honor.  Charlie Russell on

24    behalf of Grand Trunk.

25         THE COURT:  Mr. Russell, do you have any dispute that

1   Railroad Retirement Board benefits as an item of evidence

2   should not be received?

3             MR. RUSSELL:  Basically -- sorry.  Excuse me.

4             Basically, no, your Honor.  My only comment would be

5   they are not, per se, inadmissible.  They are only admissible

6   if the plaintiff opens the door.  If he does that during the

7   trial, we will agree to approach and obtain your Honor's

8   permission before we get into it.  But there is really not a

9   big dispute on this.

10            THE COURT:  All right.  That portion of the motion is

11  granted, subject, of course, to anything that occurs at trial

12  that might change the ruling, and I instruct the defendant that

13  if you intend to offer evidence on that point that you should

14  seek a discussion with the Court out of the jury's presence

15  beforehand.

16            The second item is evidence of non-back-related

17  medical conditions.  The plaintiff seeks to exclude, though,

18  any evidence that does not relate to treatment for his back

19  injuries, and I'm not sure that there is much of a dispute

20  about that, either.  But go ahead, Mr. Pearlman.

21            MR. PEARLMAN:  Well, your Honor, I am not -- I don't

22  know if there is a dispute or not.  Our position basically is,

23  this is a back injury case.  The defendants have raised the

24  issue that their expert Dr. Dawkins believes that a history

25  of nicotine use, obesity, has something to do with his back

1    problems.

2            I suspect that we can't object to those records, but

3    there are a multitude of records that have been listed that

4    have nothing to do with his back condition, his dental records,

5    his family physician records, and there is no way that the

6    defendants can establish that any of these other conditions,

7    in fact, disabled him.

8            As a matter of fact, their position through

9    Dr. Dawkins is that he is not disabled and he can go to work.

10   So we think that any records other than the ones I just

11   mentioned, and records, obviously, regarding his back should

12   not be admitted.

13           THE COURT:  All right.  Thank you.  I understand your

14   position.

15           Mr. Russell?

16           MR. RUSSELL:  Yes, your Honor.  Our position is this:

17   Mr. Faford has repeatedly denied, to virtually every single

18   treating physician he has seen, these injuries, having any

19   prior medical history at all, including the back.

20           There are records showing that he had prior shoulder

21   injuries.  There are records showing that he had a whole host

22   of other medical conditions, and it's relevant -- this evidence

23   is relevant to impeach Mr. Faford for these untrue statements

24   he made to his physicians about no prior medical history.

25           So while we agree that the injuries are limited to the

1      back in this case, that Mr. Faford did not tell his physicians

2      the full story is relevant.  So it's relevant to impeach his

3      credibility as a witness.

4           So for that reason -- and as to the chronic obesity,

5      tobacco use, and prior back injuries, I think, you know, the

6      parties agree those are relevant medical conditions because

7      they can cause the exact same injuries that Mr. Faford is

8      claiming, and there is peer-reviewed scientific literature

9      that's relied on by Dr. Dawkins in support of those opinions.

10          So that's our position.  We believe that other medical

11     conditions are relevant to impeach the plaintiff's credibility.

12          THE COURT:  Mr. Pearlman?

13          MR. PEARLMAN:  Just quickly, your Honor.

14          I mean, if he had a prior shoulder condition or injury

15     and he didn't remember it and he doesn't acknowledge it and

16     they are trying to impeach him on it, this is -- what's

17     probative about that?  It's -- it just gets into a multitude

18     of records that have nothing to do with this case.

19          Yes, if Dr. Dawkins is going to utilize nicotine

20     history, obesity, that's one thing.  But dental records, family

21     physicians?  He had a complaint of a kidney problem at some

22     point.  Nobody is going to testify that those conditions, in

23     fact, disabled him from working.  So we see those as completely

24     irrelevant and just protracting the trial without necessity.

25          THE COURT:  I'm not sure what exactly the evidence is.

1    I haven't been favored with the exact medical records that the

2    defendant seeks to offer, and therefore, it's difficult for me

3    to assess whether or not any prior alleged statements could be

4    considered as untrue statements.

5         For example, if a physician says to the plaintiff --

6    rather, not says -- but poses a direct question, "Have you ever

7    had a shoulder injury," and the plaintiff says, "No, I never

8    had a shoulder injury," but there are records that suggest

9    otherwise, that might amount to an untrue past statement.

10        On the other hand, if the physician says, "How are you

11   feeling and do you have any other complaints," and he says,

12   "No," that certainly wouldn't amount to an untrue statement,

13   necessarily.  So it really depends on context.

14        Those prior inconsistent statements, however, don't

15   seem to be relevant unless they have to do with the injuries

16   that are complained of here, unless they can be found to be

17   acts of dishonesty that could affect the plaintiff's

18   credibility, in which case we're dealing with whether or not

19   a proper foundation can be laid under 608(b).

20        So I'm going to grant the motion to the extent that

21   a generalized introduction of prior medical records that are

22   not related to causation of the presently claimed disability

23   resulting from the injury at work would be probative.

24        If the defendant believes that a proper foundation can

25   be laid under Rule 608(b) I will entertain that request at

Motion Hearing - April 12, 2021

1    trial if I can determine in context that that's relevant.

2          So the motion -- that part of the motion is granted

3    in part.

4          Next has to do with the employment application at

5    Grand Trunk and I think we're going to be going down pretty

6    much the same line there, but go ahead, Mr. Pearlman.

7          MR. PEARLMAN:  Yes, your Honor.  We're asking the

8    Court to preclude introduction of the plaintiff's employment

9    application.

10          Now, the defendant has indicated that they are not

11    going to argue that had he answered questions on that

12    application differently regarding prior back incidences or

13    conditions that they would not -- that they still would have

14    hired him.  They are not going to argue that they wouldn't

15    have hired him.  But they want to offer, I suspect, the

16    application to impeach Mr. Faford.

17          However, we submit that until Mr. Faford is asked, did

18    he indicate on his application any prior back problems, and if

19    he testifies, no, he did not, then there is no relevancy to the

20    application, which contains a lot of other information.

21          So I submit that until they -- until the defendant has

22    properly questioned Mr. Faford on that, and what I'm suggesting

23    is that if they ask Mr. Faford and he says, yes, I told them

24    about back issues, then I think introduction of the application

25    would be proper to impeach him.

 1          If he says no, then what's the value of the document?

 2 He has already testified that he didn't indicate any prior back

 3 issues.

 4          THE COURT:  Okay.  Mr. Russell?

 5          MR. RUSSELL:  Yes, your Honor.  I think your Honor

 6 hit the nail right on the head.  It's the same issue as the

 7 last motion, except in this application he denied ever having

 8 any back problem, injury, pain, disorder, as part of his

 9 entrance-into-service physical.

10          Now, Mr. Faford testified in his deposition that

11 everything on that form was in his handwriting; everything on

12 there was truthful, accurate, and complete.  And he knew that

13 if he made false statements in order to obtain employment

14 it could be grounds for termination.

15          Now, Mr. Pearlman is correct, we are not going to

16 argue or contend that we wouldn't have hired him or we would

17 have fired him if he had been untruthful, but this statement

18 where he denies ever having the exact same thing that he is

19 suing my client for, when, in fact, the records from Ford Motor

20 Company show he had multiple prior back injuries is relevant to

21 his credibility as a witness.  It could be used to impeach him.

22 And it's just a -- you know, it's a fairly straightforward

23 issue here.

24          THE COURT:  Anything else, Mr. Pearlman?

25          MR. PEARLMAN:  No.  I think it just becomes an

1    irrelevant document if he answers the question as I am certain

2    he will.

3            THE COURT:  Well, there are two things at play here.

4    One is whether or not the document can be introduced as a prior

5    inconsistent statement, which I think is really not something

6    that is going to come up, because he's not going to testify,

7    based upon all the information I have seen on this case, that

8    he told Grand Trunk that he had prior back problems, because

9    he maintains that he never did.

10           So whether it's a prior inconsistent statement under

11   Rule 613(b), I think, really is not going to come into play at

12   all here.  The question is whether or not it can be used to

13   impeach his credibility as a prior false statement or prior

14   false act, and that depends on Rule -- the governing rule

15   is Rule 608(b).  And the question is whether or not extrinsic

16   evidence can be used to prove that the defendant engaged in

17   a prior act of dishonesty, and Rule 608(b) will govern.

18           The plaintiff can be asked on cross examination

19   about his prior representations, and then the rule says that

20   depending on what the plaintiff says, the defendant has to take

21   the answer.  As to whether extrinsic evidence can be introduced

22   on that point, the rule is pretty clear that it cannot, unless,

23   of course, it has to do with a matter that is not collateral.

24           Now, the defendant's prior back injuries are not

25   collateral because the defendant argues -- I'm sorry -- the

1    plaintiff's prior back injuries are not collateral because the

2    defendant argues that the plaintiff brought his problems to

3    work with him and that they were not caused on the job.  But

4    that employment application really doesn't have anything to do

5    with that point, because it's proves the negative, or it would

6    prove the negative had it been true, so we will have to wait to

7    see how that plays out at trial.

8         The evidence is not admissible for the purpose -- for

9    one of the purposes the plaintiff is concerned about, but the

10   defendant maintains that it will not be offering the evidence

11   for that purpose anyway; that is, that they would not have

12   hired the plaintiff had his information on the application

13   been different.

14        So I'm going to grant that motion in part, deny it in

15   part, and before that application is referenced or offered into

16   evidence at trial a proper foundation under Rule 608(b) must be

17   laid.  And before it is identified as an exhibit or offered

18   into evidence the defendant must seek permission of the Court

19   outside the jury's presence.

20        The next item has to do with photographs of the

21   plaintiff's house and Mr. Faford's wife's income.

22        I think the defendant agrees that his wife's income or

23   any source of revenue coming from his wife is irrelevant and

24   does not intend to introduce that.

25        The next question has to do with whether or not

1  photographs -- and I take it it's photographs and not videos,

2  but you can clarify that -- are relevant.

3       Go ahead, Mr. Pearlman.

4       MR. PEARLMAN:  Thank you, your Honor.

5       They are photographs which we just recently have

6  seen; however, there is absolutely no probative value to

7  these photographs.  They don't prove anything.  They are just

8  photographs showing a house and a lot and a garage, and the

9  defendant's speculation that because he has got a garage he

10  must be doing auto repair in that garage.  Because there was a

11  boat next to the garage, he must be doing repairing -- doing

12  repairs on a boat.  All speculation.  There is no proof of

13  that.

14       Also, the photographs are quite misleading, because

15  Mr. Faford lives right next to a railroad track and within a

16  stone's throw of a railroad yard, none of which is depicted in

17  these photographs.  So the only purpose of the photographs can

18  be to implant in the minds of the jury that Mr. Faford lives

19  on this large estate property.

20       The other argument that the defendants make is that

21  he testified that he goes out and walks as much as he can.

22       Number one, there is no medical evidence that says

23  that he is incapable of walking.

24       And number two, again, speculation that because

25  of this lot that the house is sitting on he must walk the

Motion Hearing - April 12, 2021

```
 1   perimeter of that lot, that he is, therefore, not disabled.
 2   Again, this is all speculation.  There is no probative value to
 3   these photographs.
 4        The defendant ties in another exhibit regarding the
 5   purchase of auto parts which I think we're going to address in
 6   a different motion, but everything that the defendant is saying
 7   is speculation, not probative, and therefore, irrelevant.
 8        THE COURT:  Mr. Russell?
 9        MR. RUSSELL:  Yes, your Honor.  I view this as kind of
10   a thinly veiled attack on the surveillance video that we have
11   of Mr. Faford.  And if we're just talking about photographs of
12   the plaintiff's home, that's one thing, but the problem with
13   this is, your Honor, we believe that Mr. Faford's home also
14   doubles as a business.  Mr. Faford has a fully functional auto
15   garage that's just behind his home which is depicted in the
16   surveillance video.  Mr. Faford claims --
17        THE COURT:  Mr. Russell, I understood this motion had
18   to do with still photographs.  We're not talking about a
19   surveillance video.
20        MR. RUSSELL:  If that's -- if that's what we're
21   talking about, your Honor, I understand that, that's fine.  But
22   we may use still shots from the surveillance video to depict
23   his auto garage, to show the boat located outside his auto
24   garage that he claims he doesn't own that belongs to a friend.
25   And then, you know, three days prior to the surveillance video
```

1   that shows him going in and out of his garage, walking by this

2   boat, Mr. Faford made a substantial purchase of boat parts.

3   So as long as we're talking about still photographs of the

4   plaintiff's home, that's one thing.

5         But this household income and assets, keep in mind, he

6   has his auto garage behind his house.  He is buying auto parts

7   consistently, all the time, thousands of dollars, and he claims

8   he has no sources of income.

9         So we believe the circumstantial evidence is that

10  he has this auto garage where he does auto repairs and boat

11  repairs.  The financial records show him making substantial

12  purchases of parts.  He is going in and out of there.  He has

13  friends over there.  He has a boat located there that he says

14  he has one in his name, but it belongs to a friend, and he made

15  a purchase of boat part three days before the surveillance

16  video.

17        But as long as we're talking about still photographs

18  of the plaintiff's home, that's one thing, but if they are

19  trying to broaden this into some exclusion of the surveillance

20  video, we have a very serious objection to that.

21        THE COURT:  Mr. Pearlman, I understood your motion to

22  be directed at still photographs; is that correct?

23        MR. PEARLMAN:  You are correct, your Honor.

24        THE COURT:  All right.  That motion is granted.

25        Next, with respect to -- excuse me.  The motion

1   is granted because I find that the still photographs are

2   irrelevant, and largely, will be probably cumulative of the

3   surveillance video, although I must confess I haven't seen

4   either.  So that's not a definitive ruling, and if counsel

5   believes that the still photographs have some relevance, we can

6   take that up again in context of the trial.

7           With respect to the debit and credit card records, are

8   you contesting the admissibility of the debit and credit card

9   records relating to purchases of boat and auto parts -- boat

10  parts and auto parts, Mr. Pearlman?

11          MR. PEARLMAN:  Yes, I am.

12          THE COURT:  Okay.  Tell me why.

13          MR. PEARLMAN:  Well, first of all, our position is

14  that this list is again purely speculative.  Mr. Faford has

15  testified that between his wife's car and his kid's car, his

16  car, his parents' car, he is constantly buying auto parts for

17  repairs.  He has testified that he has not done these repairs

18  since August 3rd other than maybe minor repairs.  And so we

19  don't know from this list whose vehicle was used.  It's

20  speculative, number one.

21          And number two, it includes a year and a half period

22  where Mr. Faford returned to work after his January 3rd, 2017,

23  injury, worked consistently until August 3rd, 2018, was not

24  under any restrictions, was not under any limitations, so that

25  the exhibit itself is misleading and irrelevant as far as we're

1    concerned.

2           THE COURT:  All right.  Mr. Russell?

3           MR. RUSSELL:  Your Honor, it's the same issue, like I

4    said, with the last motion.  We believe this goes directly to

5    mitigation, damages, failure to mitigate.

6           Mr. Pearlman's argument that there is no evidence that

7    he actually earned money is irrelevant.  It's whether he is

8    capable of it.  And our position is, the circumstantial

9    evidence, him going in and out of his auto garage with the boat

10   parked there that he claims he didn't own that he is buying

11   parts for.  And it's not just minuscule.  It's 20 different

12   stores, your Honor.  It's all over the Flat Rock area, and

13   it's thousands of dollars.

14          THE COURT:  All right.  Is there evidence that you

15   intend to offer about purchases that you describe before the

16   August injury?

17          MR. RUSSELL:  No, your Honor.

18          THE COURT:  Is it all after the August injury?

19          MR. RUSSELL:  I believe so.  I think there may be some

20   boat purchases, auto parts purchases, I'll have to go back and

21   look, between the 2017 and 2018 injury, but I feel --

22          THE COURT:  Do you intend to offer any other evidence

23   of purchases from the debit or credit cards other than boat and

24   auto parts purchases after the August 2018 injury?

25          MR. RUSSELL:  The only other category of purchases,

1   your Honor, are tobacco products.  Mr. Faford, all the time,

2   reports to his physicians that he is not smoking.  Our position

3   is tobacco use, nicotine, is a vasoconstrictor.  It causes

4   degenerative disk disease.  Our experts are going to testify

5   to it.

6           These records also show, and Mr. Faford testified in

7   his deposition, that he is making substantial purchases of

8   tobacco products after these injuries and during all relevant

9   time periods.

10          So we would also offer them for that, that purpose as

11  well.

12          THE COURT:  Mr. Pearlman, anything else?

13          MR. PEARLMAN:  I'm just trying to figure out, Judge,

14  because the chart as I saw it contains 2017 entries, 2018

15  entries.  So is the defendant saying that they are going to

16  edit that chart and not offer any items prior to August 3rd?

17  Is that what I understand the defendant's position is?

18          MR. RUSSELL:  No, your Honor, I --

19          THE COURT:  I'm not sure what the defendant's position

20  is on that, Mr. Pearlman, but I just want to hear your final

21  summation on this so I can make a ruling.

22          MR. PEARLMAN:  Yes.  Thank you.  I think that they are

23  irrelevant.  I think entries of purchases of tobacco doesn't

24  prove anything.  What's the probative value of it?

25          THE COURT:  He just explained that, Mr. Pearlman.  He

1    said it has to do with his -- your client's denial to his

2    physician that he smokes and that continued smoking can

3    aggravate the disability caused by whatever injury he has,

4    although I'm not -- I'm not sure how that evidence would be

5    relevant as to whether it is a cause by itself or whether it

6    simply aggravates a condition that was caused by an injury

7    received on the job, and without some way to connect that up

8    I have some questions about it.

9            Do you have anything else, Mr. Pearlman?

10           MR. PEARLMAN:  Yes.  The only other point is that

11   Mr. Faford has never denied that he chewed tobacco.  It's in

12   his medical records that he does use chewing tobacco.  Again,

13   I think it's irrelevant.  I just don't see the probative value

14   of that.

15           THE COURT:  All right.

16           MR. RUSSELL:  Your Honor, just to answer your question

17   from earlier, we do not intend to offer evidence of boat and

18   auto part purchases until after the August 18 injury.  And so

19   if we use that chart, it would be revised to redact out the

20   2017 purchases when Mr. Faford was employed.

21           THE COURT:  All right.  The motion is granted in

22   part -- or this aspect of the motion is granted in part and

23   denied in part.  The defendant may offer evidence of boat and

24   auto purchases that occurred after the August 2018 injury.

25   Before that time, the evidence would be irrelevant.  Other

1    purchases likewise would be irrelevant.

2          As to purchases of tobacco products, I don't suppose

3    that those credit card statements contain itemized lists of

4    what's been purchased, and I'm not sure that any of that is

5    relevant and they won't -- should not be offered until there

6    is a proper foundation laid to establish the relevance, if any,

7    of that information concerning tobacco purchases.

8          Next, the plaintiff seeks to exclude evidence of

9    articles and opinions on secondary gain which the defendant

10   apparently intends to use to question the plaintiff's expert

11   witnesses about.

12         We have already been down this road before and I have

13   excluded that evidence, and I believe it was a Daubert motion

14   that was filed by the plaintiff, but this looks like it is a

15   slightly different purpose to cross examine defendant's --

16   plaintiff's experts.

17         But go ahead, Mr. Pearlman, on that part of your

18   motion.

19         MR. PEARLMAN:  Well, I do agree with the Court, we

20   have dealt with this motion, and the Court issued an order on

21   the Daubert motion regarding Dr. Dawkins.  The issue that we

22   have with this issue is, number one, there is no way that

23   the defendant is going to authenticate these studies since

24   Dr. Dawkins has been excluded to render any opinion on it.

25         Dr. Aleem has already been taken and he is -- his

1    testimony is done.  Mary Monte that the defendant's speak of is

2    not a -- she is a physical therapist.  I don't know how they

3    would qualify her to render an opinion on a peer review study

4    regarding medical doctors.

5            So you have already ruled on it regarding Dr. Dawkins.

6    I don't see the difference in why it should be different with

7    any of the other offers that the defendants may attempt in

8    trying to get that -- those documents into evidence.

9            THE COURT:  All right.  Mr. Russell?

10           MR. RUSSELL:  Yes, your Honor.

11           These articles that Mr. Pearlman is talking about can

12   be used in a way where the term "secondary gain" and "recall

13   bias," which were the two terms your Honor was concerned about

14   on the Daubert motions as impugning Mr. Faford's credibility,

15   having an expert testify about whether a witness is credible

16   or not.

17           The problem here is that Mr. Faford's physicians, his

18   experts, without conducting a forensic review of his lifetime

19   medical records, the ones that have been produced in this case,

20   simply rely on what Mr. Faford tells them in terms of his prior

21   medical history and past injuries.

22           And the problem with that is, there are peer reviewed

23   scientific studies that say that the premise that examining

24   self reports are scientifically reliable have repeatedly failed

25   scientific testing.  And it's our position that those experts

1    should have done more than simply take Mr. Faford's word for it

2    and that their opinions are unreliable, the weight of their

3    opinions.  The jury should disregard or give it the weight

4    that it deserves, because all they have done is listen to

5    Mr. Faford.  And, quite frankly, he provided a vastly

6    incomplete prior history.

7           He tells his physicians over and over and over, never

8    had any prior back problem, never had any prior back injuries.

9    So these articles that we're talking about can be used in a

10   way with -- to impeach these experts without ever mentioning

11   secondary gain and recall bias, which were the terms at issue

12   in the Dawkins motion.

13          THE COURT:  Well, couldn't you impeach the experts

14   without even mentioning the articles?

15          MR. RUSSELL:  More than likely, yes, your Honor.  But

16   the fact that there is scientific -- peer-reviewed scientific

17   literature that explains that there is, you know, things they

18   should have known about, they should have known better than not

19   to do that, and they based their treatment decisions, their

20   diagnoses, on inaccurate, incomplete statements of Mr. Faford

21   about his prior medical history.

22          THE COURT:  Is there any evidence that they relied on

23   those articles in formulating their opinions?

24          MR. RUSSELL:  Not that I know of, your Honor.

25          THE COURT:  Is there any evidence that they are even

1    aware of those articles?

2            MR. RUSSELL:  Well, some of them haven't even been

3    deposed yet, so I don't know the answer to that question.

4            THE COURT:  Have you -- how do you intend to

5    authenticate the articles?

6            MR. RUSSELL:  Well, I intend to use them with my

7    expert Dr. Dawkins to ask him, you know, is it reliable for

8    the plaintiff's treating physicians to rely on the history

9    that Mr. Faford provided.  He's going to say no.  And so what's

10   the basis for that opinion?  The peer-reviewed scientific

11   literature that says examinee self-reports are unreliable.

12           THE COURT:  All right.  Mr. Pearlman?

13           MR. PEARLMAN:  Well, I think that that's the ruling

14   that you made in regards to the Daubert motion on Dr. Dawkins.

15   So I don't know how they can backdoor that.  And that's --

16   the question that you asked Mr. Russell is my question.  How

17   are they going to authenticate these peer reviewed studies?

18   So I --

19           THE COURT:  He just said he is going to call

20   Dr. Dawkins, and Dr. Dawkins is going to authenticate them.

21           MR. PEARLMAN:  Well, except for the fact that you've

22   already ruled that Dr. Dawkins can't testify to those issues

23   and that seems to me to be a backdoor way of getting those

24   articles in.  So I would object on that basis.

25           THE COURT:  Well, I'm not sure that those articles

1    would be admissible under Rule 803, paragraph 18.  I'll leave

2    it to counsel to try to authenticate them under that rule if

3    they can be used.  That really kind of calls into question an

4    order of proof, but we will have to cross that bridge as well.

5         I don't see that there is any objection to allowing

6    cross examination of your expert witnesses on the point of

7    whether it's prudent to accept a self-report from a patient

8    concerning a diagnosis.

9         I mean, doctors do have to take history and do have

10   to make an assessment about whether or not there is something

11   that should call into question what the patient is reporting.

12   Doctors do that all the time.

13        But that motion to exclude, in advance, expert

14   testimony about the propriety of accepting self-reports would

15   be denied.  The effort, however, to tie that into issues

16   relating to secondary gain and recall bias, however, would

17   be granted.

18        Moving on to --

19        MR. PEARLMAN:  I'm sorry, Judge.  I don't mean to

20   interrupt, but would the defendant be precluded in opening

21   statement from making reference to those articles until they

22   have been properly qualified and admitted?

23        THE COURT:  I think that a defendant or any party

24   takes a great risk in making reference in opening statement

25   to evidence that is of questionable admissibility, because the

1    fact of promising information that ultimately may not be able

2    to be delivered is a hazard, I think, that is difficult to

3    overcome.  That -- I think it would be imprudent because it

4    also might provoke a mistrial.  So I'll just leave it at that.

5           MR. PEARLMAN:  Thank you, your Honor.

6           THE COURT:  Next, concerning evidence about lack

7    of communication of workplace hazards, I believe that the

8    plaintiff wants to preclude evidence that Mr. Faford violated

9    company rules by failing to inform other workers of workplace

10   hazards after he tripped and fell in the -- in August of 2018.

11   I think that's what the evidence is -- that's what the motion

12   is focusing on; is that correct, Mr. Pearlman?

13          MR. PEARLMAN:  It is, your Honor.

14          THE COURT:  Go ahead with your argument.

15          MR. PEARLMAN:  Basically, I rely on our brief.  I

16   just don't see -- Mr. Faford did report his injury to the

17   supervisor.  The fact that he didn't go around and tell

18   everybody on the property that he fell or that there was debris

19   in the area where he was walking and inspecting rail cars, I

20   think, is irrelevant and speculative.  There is no question

21   that he reported this injury.

22          I'm sure that the defense attorneys can cross examine

23   him sufficiently as to what he reported, et cetera, but I think

24   that to speak of violating a rule -- and it probably also goes

25   to the January 3rd, 2017, incident, where he also reported to

1    his supervisor, Mr. Hammock, that he got injured and where he

2    got injured.  So we just don't see the necessity of the rule

3    and the --

4              THE COURT:  Mr. Pearlman, just a minute, please.

5              Are you focusing on the August incident or the January

6    incident?  Because I understood your motion just to be focusing

7    on the August incident.

8              MR. PEARLMAN:  Well, it is, your Honor.  It is.

9              THE COURT:  Well then, let's leave it at that.

10             MR. PEARLMAN:  I'll leave it at that, sir.

11             THE COURT:  So it's -- you're saying that you're

12   concerned about the defendant offering evidence that there is

13   a work rule that the defendant -- that the plaintiff violated

14   by not reporting the trip hazard in August and you're saying

15   that he did report it?

16             MR. PEARLMAN:  Yes.  He made a report to his

17   supervisor.

18             THE COURT:  So what's -- so why are we dealing with

19   this as a motion in limine?  I mean, it's a contested fact

20   issue.  You're saying that he reported the incident.  The

21   defendant is going to offer evidence that he did not report it

22   and that he made inconsistent statements, and he didn't come

23   up with the fact that he tripped over a rock until later on

24   when he took -- when his deposition was taken.

25             So those are conflicting items of evidence that the

1    jury has to resolve.  Why are we dealing with trying to exclude

2    evidence of one thing or another?

3              MR. PEARLMAN:  Well, we're trying to -- our focus is

4    on this rule, this peer communication rule, that has nothing

5    to do with this case or this accident.

6              THE COURT:  All right.  Go ahead, Mr. Russell.

7              MR. RUSSELL:  Yes, your Honor.

8              The safety rules require Mr. Faford to make a

9    contemporaneous report of a workplace hazard to his co-workers,

10   not only just to report the injury immediately to his

11   supervisors.  And here the evidence in the case is going to be

12   that when Mr. Faford encountered whatever he encountered on

13   August 3rd, 2018, there was no contemporaneous report made to

14   his co-worker, Matt Johnson.

15             When he got in the truck with Mr. Johnson, he did not

16   mention a rock or any tripping hazard.  He told Mr. Johnson,

17   "I rolled my ankle and fell."  He didn't say anything about any

18   workplace hazard.  It's undisputed he did not do that.  And

19   it's our position that because of that obligation to make

20   immediate and contemporaneous reports to co-workers that the

21   jury can infer that no such workplace hazards existed.  And

22   so that's our position on this motion.

23             THE COURT:  All right.  Where is that work rule

24   established?

25             MR. RUSSELL:  It's in the safety rules that are issued

1    to Mr. Faford and govern his work, the life safety rules.  It's

2    one of the trial exhibits.

3             THE COURT:  Okay.  The relevance of that is perhaps

4    marginal, but relevancy is established by a relatively low

5    threshold; consequently, the evidence certainly is not -- there

6    is no unfair prejudice resulting from the evidence, and it is

7    relevant.  The motion is denied in that respect.

8             The next argument is Item Number 8 on that list of

9    10 having to do with the so-called empowerment rule, and that

10   is whether the defendant can introduce evidence that tends to

11   eliminate the assumption of risk as a -- or tends to revive

12   the assumption of risk as a defense, which is not a pertinent

13   defense under the FELA.

14            Go ahead, Mr. Pearlman.

15            MR. PEARLMAN:  Well, I think that that's basically the

16   argument.  This empowerment rule shifts the burden of providing

17   a safe place to work.

18            THE COURT:  Well, what's the evidence that you're

19   looking to exclude?

20            MR. PEARLMAN:  Well, they are claiming overexertion.

21   They are claiming that Mr. Faford didn't have to do the job if

22   he didn't think he had the right tools.  So it's a backdoor way

23   of -- the only conclusion from that is that he assumed the risk

24   on both August 3rd, 2018, and primarily on January 3rd, 2017.

25            It just -- there is clearly -- and the railroad admits

1    it, that there is no assumption of risk defense in FELA

2    cases. This empowerment rule is so vague.  It is so general.

3    Overexertion to one person is not overexertion to someone else,

4    but it's shifting the duty onto the employee.

5           They have every right to argue comparative negligence

6    issues.  That's certainly a defense.  But we think the use of

7    this rule is prejudicial and of no probative value.

8           THE COURT:  Mr. Russell?

9           MR. RUSSELL:  Yes, your Honor.  This is another safety

10   rule that goes directly to plaintiff's contributory negligence,

11   a defense that is specifically permitted by statute.

12          The empowerment rule is a rule that says that when

13   there is no specific safety rule governing a situation a

14   railroad worker is empowered to seek out assistance, guidance

15   from his supervisors, that he is to utilize common sense, good

16   judgment, all the things that we're saying that Mr. Faford

17   did not do, especially with respect to his first incident.

18          This motion in limine has been routinely denied by

19   other federal courts, including the three cases that the

20   plaintiff cites, the Stanley, Droll, and Parra cases.  In those

21   cases the Court allowed evidence of the empowerment rule, but

22   denied a jury instruction quoting the exact language of the

23   rule.

24          As for assumption of risk, this is an issue that comes

25   up routinely in FELA cases at the jury instruction conference,

1    and I submit that the proper time to address it is at that

2    conference.  But this motion ought to be denied.

3             THE COURT:  Anything else, Mr. Pearlman?

4             MR. PEARLMAN:  No, your Honor.

5             THE COURT:  I agree, the authority that counsel cites,

6    Stanley, Droll, and Parra all condone, if not specifically

7    approve, the introduction of evidence in that regard.  The

8    question does boil down to jury instruction and we will deal

9    with it at that time.

10            Item Number 9 has to do with any arguments or evidence

11   that tend to point the finger at co-workers for the unsafe

12   condition.  I'm not exactly sure what the specific evidence is

13   that the plaintiff is concerned about here, but if there was

14   evidence that a co-worker was responsible for an unsafe

15   condition, I would think that that would be helpful to the

16   plaintiff since that activity would be chargeable to the

17   defendant in the case.

18            But anyway, Mr. Pearlman, what do you want to exclude

19   and why do you want to exclude it?

20            MR. PEARLMAN:  Well, the defendants have taken a

21   position throughout several of the depositions taken that, for

22   example, if there is debris in the yard it's the duty of the

23   co-employee to pick it up when, in fact, it's the duty of the

24   railroad to maintain a clean work environment.

25            There is testimony in the January 3rd, 2017, accident

1    that there were three shifts working in the shop back at that

2    time, and one of the claims is that Mr. Faford, on the third

3    shift, was not provided with updated new tools, but, in fact,

4    other shifts did, in fact, have updated tools and that they

5    kept them under lock and key in some type of cabinet or some

6    type of tool box, which the implication was that it's the fault

7    of these other employees for not releasing those tools to the

8    third shift.

9           So the motion was basically filed so that we could

10   get a clarification, can you -- yes, and I agree with you,

11   Judge, that to blame a co-employee, they are blaming the

12   railroad through implication, but there was argument about

13   union -- union affiliation, that it was a question of the

14   union, so it just seems like it's irrelevant.  We're looking

15   to preclude it.

16          THE COURT:  What are you looking to preclude?

17          MR. PEARLMAN:  Testimony that it's the employees

18   who locked up their tools on the second shift's fault that

19   Mr. Faford had an inadequate old tool to use.

20          THE COURT:  All right.  Mr. Russell?

21          MR. RUSSELL:  Your Honor, we are not blaming any

22   co-workers for Mr. Faford's injuries.  Our position is that

23   there were no unsafe conditions in the workplace that caused

24   plaintiff's back injuries.  So I'm like you, I don't understand

25   what the evidence is that they are trying to preclude.  You

1    know, we're not blaming these workers from the other shifts

2    that locked up their tools.  We don't believe the evidence is

3    going to show that, but we're certainly not blaming any

4    co-workers for any workplace hazards.

5         THE COURT:  This aspect of the motion is pretty vague,

6    as far as I'm concerned, and I can't really identify any

7    evidence on which I can make a ruling at this point.  I'm going

8    to deny it without prejudice and leave it to the context of the

9    trial and the contemporaneous objection custom and rule.

10        MR. PEARLMAN:  Judge, if I may, is the defendant

11   asserting that they will not raise that issue and point the

12   finger at other employees as being at fault?

13        THE COURT:  I don't know, Mr. Pearlman.  You will have

14   to take that up with Mr. Russell.  That's an argument that if

15   they point the finger at other employees for being at fault, I

16   would think that would be at their peril, and we can take that

17   up also at the charge conference.

18        MR. PEARLMAN:  Thank you, Judge.

19        THE COURT:  And then Item Number 10, the last item on

20   the plaintiff's list, has to do with the absence of evidence,

21   I guess.  And that really, I think, is focusing on a potential

22   argument that because no one else complained then the condition

23   was not unsafe.  I believe that's what the thrust of the

24   argument is from the plaintiff.

25        But go ahead, Mr. Pearlman.

1        MR. PEARLMAN:  No, I think you have said it, Judge.

2    I think the fact that there is no similar injuries to other

3    employees on January 3rd, 2017, does not imply and should not

4    be argued that there is, therefore, no negligence.  I think the

5    case law has dealt with that issue fairly clearly.  There is

6    testimony --

7        THE COURT:  Well, I think it has, Mr. Pearlman, but I

8    don't think it has dealt with it fairly clearly in your favor.

9        MR. PEARLMAN:  Well, the -- if you look at, I think,

10   our reading of Gallick v. Baltimore & Ohio Railroad at

11   372 U.S. 108, I think that states the United States Supreme

12   Court has stated clearly that --

13       THE COURT:  Well, that was a jury instruction case,

14   not an evidence case, was it?

15       MR. PEARLMAN:  Well, the fact -- I think it was, but I

16   also think that it goes to the issue of, the fact that there is

17   an absence of an injury does not mean that the railroad is not

18   negligent for the condition that existed on the date of the

19   accident.

20       THE COURT:  Well, in that particular case I thought

21   the Court said that the evidence was relevant on the question

22   of establishing foreseeability, although the jury should

23   not have been instructed because that was too narrow an

24   instruction.

25            And then the defendant points to Inman, Burpo, and

1    Ambold, in which the courts have held that that evidence is

2    relevant or the absence of reports is relevant on the question

3    of foreseeability.  That's why I'm struggling with your

4    position here.

5         MR. PEARLMAN:  Well, I think that Gallick really --

6    our reading of Gallick is that if you can't instruct the jury

7    about prior incidents, how can you offer that as evidence that

8    there is no negligence?

9         THE COURT:  Well --

10        MR. PEARLMAN:  Maybe I'm --

11        THE COURT:  I would -- I'll deny the motion to the

12   extent that it seeks to preclude the defendant from arguing

13   that there was no foreseeable risk or workplace hazard because

14   no one ever reported a hazard as a result of -- a hazard

15   resulting from bad stairs, worn-out wrenches, or trip hazards

16   in the yard.  So that aspect of the motion is denied.

17        The next motion is Docket Number 111 in which the

18   defendant seeks to exclude 15 categories of evidence.

19        Before we go into the argument of that, who is taking

20   that, by the way?

21        MR. RUSSELL:  I will, your Honor.  Charlie Russell.

22        THE COURT:  I think I'm going to give the court

23   reporter and me and everyone else a little bit of a break, so

24   we will take five minutes and we will get back to that shortly.

25   So the Court is in recess for five minutes.

1       MR. WILENSKY:  Your Honor, I'm sorry.  I just wanted

2   to say, I'm handling this motion for the plaintiff.

3       THE COURT:  Thank you for clarifying, Mr. Wilensky.

4   But we're in recess for five minutes and we will get to you

5   then.  Thank you.

6     (Recess taken from 11:03 a.m. to 11:12 a.m.)

7       THE COURT:  Mr. Russell, are you ready to continue?

8       MR. RUSSELL:  I am, your Honor.

9       THE COURT:  Mr. Wilensky?

10      MR. WILENSKY:  Yes, your Honor.

11      THE COURT:  All right.  Court is back in session.

12      Item Number 1 on the defendant's motion has to do with

13  references to workers' compensation.  I'm not sure if we really

14  need to spend much time on this.

15      There may be a request for a jury instruction on that

16  point per the previous motion argument, but I don't think

17  anybody really contests the fact that references to workers'

18  compensation are not relevant and generally inadmissible in

19  cases like this.

20      Mr. Russell, do you have much more to say on that?

21      MR. RUSSELL:  No, your Honor.  I think the plaintiff

22  said they only object to this to the extent it precludes an

23  instruction.  We believe an instruction is improper along

24  those lines, but we can take that up at the jury instruction

25  conference.  We don't need to address it now.

```
 1            THE COURT:  Agreed, Mr. Wilensky?

 2            MR. WILENSKY:  Only that I think, your Honor,

 3   depending on the way that the proofs in this case come out it

 4   may be warranted for us to discuss this even before the jury

 5   charge conference, because the defendant is likely to try and

 6   introduce a record of plaintiff making a workers' comp claim

 7   while he was at Ford Motor Company, and we reserve objections

 8   to that.  But if it's admitted, the issue of workers' comp is

 9   going to be put right in the jury's face and the jury may

10   reasonably wonder whether, you know, any money they award

11   plaintiff will be in addition to comp benefits received.

12            So if the defendant is planning to use that record,

13   it may be that a charge along the lines of what we're talking

14   about is appropriate during the trial and not before.  But we

15   don't intend on making any argument that, you know, he isn't

16   eligible for workers' comp and so this is his only chance to

17   be compensated or anything along those lines.

18            THE COURT:  Well, if that evidence is offered and

19   received it may bolster your position regarding a jury

20   instruction, but we'll take that up at the appropriate time.

21            That motion is granted, however, that there should be

22   no reference in evidence to workers' compensation.

23            Next, the defendant argues that the plaintiff should

24   not be permitted to argue about the purpose of the Federal

25   Employer's Liability Act or make any reference -- references
```

1    to what the law is, at least as I understand the argument.

2    I'm not sure how far you want to go with that, Mr. Russell.

3             MR. RUSSELL:  Not very far at all, your Honor.

4             The plaintiff concedes in his response that he is not

5    going to make a comment regarding Congress's intent in enacting

6    the FELA.  Our position is that the jury is going to be

7    instructed on the law and it should come from you, not from

8    counsel.  So I'm not sure there is a big dispute here, but our

9    position is the plaintiffs should not be allowed to tell the

10   jury what the law is or argue to the jury.  That's the duty of

11   the courts.

12            THE COURT:  Are you telling me that the plaintiff

13   shouldn't be able to tell the jury what the law requires him

14   to prove and how he is going to prove it?

15            MR. RUSSELL:  No, your Honor.  What I'm talking about

16   is the plaintiff should not be able to tell the jury that the

17   FELA was enacted for the broad remedial purpose of, you know,

18   compensating injured railroad workers.

19            THE COURT:  Well, that's different from what you just

20   concluded your argument with.

21            MR. RUSSELL:  Well, that's -- that's what I meant.

22   I'm sorry.  I must have misspoke.  But that's what I'm -- I'm

23   not saying that the plaintiff can't talk to the jury or tell

24   the jury what the elements of his claim are as set forth in the

25   instructions you provide.

1      THE COURT:  Mr. Wilensky, do you have any intention to

2  argue policy here?

3      MR. WILENSKY:  No.  We're not going to be making

4  policy arguments about what Congress intended to do by enacting

5  the FELA.  But to your point, your Honor, I think that we

6  should be able to contextualize the facts of the case by

7  stating generally what the law is and what we have to prove

8  under the law and how we will meet our burden in that regard.

9      THE COURT:  I agree that that's entirely appropriate

10  for opening statements and closing arguments.  The jury will be

11  instructed, I think, probably repeatedly in this case that they

12  must take their law from the Court and not from the parties,

13  and if what you say differs from what I say they must follow

14  what I say.  That's pretty standard in every case.

15      On the other hand, you have to be able to identify the

16  elements, and that is what the issues are in the case and what

17  the evidence will be offered -- what evidence will be offered

18  in order to establish those elements.  So to that extent, the

19  motion is denied.

20      Next, the plaintiff wants to -- I'm sorry -- the

21  defendant wants to exclude evidence of any proof of the fact

22  that the plaintiff was a good person, a good employee, or a

23  safe worker, and acted in conformity with this trait that might

24  evoke sympathy on his part.

25      Mr. Russell, if I am mischaracterizing that position,

1    please correct me.

2          MR. RUSSELL:  No, your Honor.  I think you

3    characterized it correctly.  There has been deposition

4    testimony from co-workers, you know, is Mr. Faford a good,

5    safe worker?  Does he work safely on the job?  And we believe

6    that testimony has been elicited by the plaintiff's counsel in

7    order to prove that on the dates in question Mr. Faford acted

8    in conformity with those traits, and so that somehow because he

9    was a good, safe worker and he had this trait that he couldn't

10   have possibly been responsible for contributory negligence.

11         Contributory negligence, that defense does not make

12   general character evidence of this nature admissible and it

13   ought to be excluded.  This is classic character evidence.

14         THE COURT:  Mr. Wilensky?

15         MR. WILENSKY:  Well, your Honor, I think it's true

16   that the plaintiff's co-workers testified that he was a

17   reliable and safe employee, but given that the defendant is

18   advancing arguments that plaintiff caused his own injuries

19   and they brought out testimony from plaintiff's supervisor

20   Mr. Hammock that in his opinion Mr. Faford was an average

21   employee who on occasion didn't work safely, I think that

22   we're entitled to establish the plaintiff's general competency

23   through the testimony of others.

24         It may also be admissible as evidence of his habit

25   under Rule 406, in that he didn't have the habit of taking

1   unnecessary risks and working unsafely.  So I do think that it

2   may be admissible for that purpose, and if anything, the Court

3   should defer its ruling.

4          But as we also stated in our response that, you know,

5   if the Court grants this motion, what's good for the goose is

6   good for the gander, and the defendant shouldn't be allowed to,

7   you know, make an argument or put on evidence that it generally

8   is a good employer or safe employer if this motion is granted.

9          THE COURT:  Mr. Russell, anything else?

10          MR. RUSSELL:  I tend to agree with Mr. Wilensky on

11   that last point that Grand Trunk is not going to offer evidence

12   that Mr. Faford was an unsafe employee, an average employee, to

13   show that he acted in conformity with those traits on the day

14   of the accident.

15          So our focus is on what happened with respect to each

16   of these accidents, not someone's general character, and I

17   think all evidence of character evidence ought to be excluded.

18          THE COURT:  Well, evidence of character in order

19   to prove conduct is inadmissible under Rule 404(b), first

20   sentence, and also under Rule 401(a)(1), and I will not permit

21   it for that purpose.

22          It may be admissible for other purposes, for example,

23   if somebody were to testify, as apparently had occurred in

24   deposition, that Mr. Faford generally was an unsafe worker,

25   then evidence that he was not may be offered to rebut it.

1           As to evidence of habit, that is a pretty marginal

2    argument, Mr. Wilensky, and it would be pretty tough to

3    establish that.  Take your best shot, but I am thinking that

4    that's -- there is not a lot of future in that position.

5           Nonetheless, I'm going to deny this motion without

6    prejudice, cautioning counsel to avoid offering character

7    evidence to prove conduct, as the rules pretty clearly

8    prohibit.

9           Next, Item Number 4, evidence of Grand Trunk's

10   financial condition.  I don't think that the defendant --

11   the plaintiff intends to offer any of that evidence, do you,

12   Mr. Wilensky?

13          MR. WILENSKY:  We do not, your Honor.

14          THE COURT:  All right.  That motion is granted for --

15   because the point is conceded.

16          Next is evidence that the plaintiff's family suffered

17   financially, physically, or emotionally as a result of the

18   plaintiff's individual injuries.  There is no consortium claim

19   here, and as I understand it, the defendant wants to exclude

20   any such evidence.

21          This apparently is -- points out that there might be

22   testimony which may tend to suggest the point but not entirely

23   make it, and I'm interested in, Mr. Russell, how you propose

24   that we draw lines here?

25          MR. RUSSELL:  Your Honor, I think -- I think the

1  parties agree that the focus is on how the injuries affected

2  the plaintiff, not his family, so as long as that is the focus,

3  you know, we're good with it.  I thought this had been

4  conceded, but I may be wrong.

5          THE COURT:  I think you're probably correct on that.

6          Mr. Wilensky, do you disagree?

7          MR. WILENSKY:  Not really, your Honor.  The only

8  nuance here, I mean, we're -- we're going to have Mrs. Faford

9  testify about how she has seen Mr. Faford affected by his

10  injuries in her perception, but we're not going to be putting

11  on testimony from her or from Mr. Faford about how Mr. Faford's

12  injuries have affected other members of his family.

13          THE COURT:  Well, this is where I see some problems

14  potentially developing, and that would be testimony from his

15  wife, for example, that she has seen her husband suffer because

16  he has been unable to provide for his family in ways that cause

17  them harm, grief, and emotional distress, and in turn, that

18  causes him to be distressed as a result of it.

19          Do you see where I'm going with that, Mr. Wilensky?

20          MR. WILENSKY:  I do to an extent, your Honor, but I

21  think that to the extent that that would be affecting

22  Mr. Faford, I think that that's fair game.

23          THE COURT:  Well, perhaps.  I guess it depends on

24  how it's phrased.

25          Mr. Russell, I'm going to deny this without prejudice

 1    and leave it to contemporaneous objections.

 2            But you know, Mr. Wilensky, that I would not permit

 3    evidence that suggests that it would be offered in support of

 4    a consortium claim when there is no such claim.

 5            Do you understand?

 6            MR. WILENSKY:  I do, your Honor.

 7            THE COURT:  Mr. Russell, are we clear on that?

 8            MR. RUSSELL:  Yes, your Honor, I understand.

 9            THE COURT:  Okay.  Thank you.

10            Subsequent remedial measures, and that, I think, turns

11    on whether or not there is evidence of feasibility, but go

12    ahead, Mr. Russell, with your argument on that.

13            MR. RUSSELL:  Sure, your Honor.  That, you nailed

14    the -- you hit the nail right on the head.  It centers on

15    feasibility.  The plaintiff's argument is that testimony from a

16    lay witness supervisor on cross examination during a discovery

17    deposition where he gave his opinion over the objection of GTW

18    counsel that a particular measure was not feasible, that is, to

19    attach the stairs to the wall, makes it admissible.  That is

20    not GTW's position.  That evidence is not going to be offered

21    by GTW at trial.

22            This witness was asked spur of the moment and he gave

23    his opinion.  But we're not taking the position that any of

24    the subsequent remedial measures that were taken following

25    Mr. Faford's first incident were not feasible and do not plan

1    to do so at trial and will not do so at trial.

2           THE COURT:  Mr. Wilensky?

3           MR. WILENSKY:  Your Honor, we allege that the

4    plaintiff was injured in the first incident in part because

5    there was the gap in that -- between the staircase where

6    plaintiff was standing and the adjacent wall.

7           You know, the testimony here was from Mr. Grandberry,

8    who is not just plaintiff's supervisor, he is designated as an

9    expert witness by the defendant regarding the staircase and the

10   area where the plaintiff was hurt.  And he testified under oath

11   that he didn't think it was feasible for the staircase to be

12   affixed to the wall, but that's exactly what happened after the

13   fact.

14          Their expert supervisor contested the feasibility of

15   this repair, and under 407 I think that that's -- that makes

16   the subsequent remedial measure admissible.

17          THE COURT:  Well, it all depends on what he says,

18   doesn't it?

19          MR. WILENSKY:  I suppose so.  I think that the

20   foundation would have to be established first, but the motion

21   should not be granted ahead of time because that testimony is

22   on the record.  And if he testifies similarly at trial, this --

23   it's then contested.

24          THE COURT:  Well, that's true.

25          I'm not going to permit you to offer evidence in your

1   case-in-chief that they fixed it afterward, after the accident

2   occurred.

3          MR. WILENSKY:  Okay.

4          THE COURT:  You understand that; right?

5          MR. WILENSKY:  I do, your Honor.

6          THE COURT:  All right.  I will permit you to offer

7   evidence of feasibility by proving that, in fact, that

8   repair was made and, you know, you can ask the individual on

9   cross examination if the workplace could have been made safer

10  by attaching the stairs to the wall.  And if he says, "Yes, I

11  think it could have," then we're done.  If he says, "No, I

12  don't think it could have," then that lays the foundation.

13         What I don't want you to do, however, is if he says,

14  "Yeah, I concede the point that it could be attached," for you

15  to impeach him with his prior deposition testimony in order to

16  set up a feasibility argument.

17         MR. WILENSKY:  Okay.

18         THE COURT:  So that motion is granted in part and

19  denied in part.  It's granted to the extent that you may not

20  offer evidence of that subsequent remedial measure in your

21  case-in-chief for the purpose of proving negligence.  It is

22  denied subject to a proper foundation being laid to make

23  feasibility evidence relevant in that regard.

24         Do you understand, Mr. Wilensky?

25         MR. WILENSKY:  I do, your Honor.

1           THE COURT:  Do you, Mr. Russell?

2           MR. RUSSELL:  I do, your Honor.

3           THE COURT:  Okay.  Thank you.

4           Now that sort of dovetails into the next question and

5    whether or not the defendant seeks to include -- I should

6    say -- the defendant seeks to exclude evidence of safer

7    alternative methods of performing the job at issue in this

8    case.

9           What exactly are you trying to exclude here by this

10   motion, Mr. Russell?

11          MR. RUSSELL:  Well, your Honor, I think that's kind of

12   our point here is that the plaintiffs haven't identified any

13   safer alternative.  They are not -- there has been none

14   disclosed in discovery.

15          And it is, you know, the Johnson case, which is an

16   Eastern District of Michigan case from 2008, that says that

17   safer alternatives are not relevant.  But I'm not sure what

18   safer alternatives the plaintiffs are intending to argue here,

19   because none have been disclosed, and they don't identify any

20   in their response that they intend to offer.

21          THE COURT:  The Johnson case was not an evidence case,

22   that was a summary judgment case.  Wasn't that Judge Cleland's

23   case you're talking about?

24          MR. RUSSELL:  Yes, your Honor.

25          THE COURT:  All right.  And that really had to do with

Motion Hearing - April 12, 2021                                    50

1    whether or not possible safer alternatives, unnamed, would save

2    the plaintiff's case from summary judgment, not whether or not

3    if there were evidence, actual evidence, nonspeculative

4    evidence of safer alternatives that would be admissible in

5    court or not.

6              MR. RUSSELL:  That is correct.

7              THE COURT:  Shouldn't I read the case that way?

8              MR. RUSSELL:  I agree with that, your Honor, but there

9    are numerous other decisions that are cited in our -- in our

10   motion and brief, Stillman, the Dixon decisions, that also say

11   proof of safer alternatives is not relevant.  The question is

12   whether the workplace was relevant on the date in question.

13             THE COURT:  All right.  Mr. Wilensky?

14             MR. WILENSKY:  Well, your Honor, I think that this

15   motion goes hand in hand with their Motion in Limine Number 9,

16   the access to the newer and safer tools, and that's

17   specifically the safer methods which are very much relevant

18   in this case, and we certainly plan to present evidence on.

19             We have alleged in this case that plaintiff was not

20   given safe tools and that the old, worn-out wrench he had to

21   use to perform the repair in the January 2017 injury, it

22   slipped and that was a cause of that first injury.

23             You know, there's testimony from multiple witnesses

24   that other Grand Trunk employees on different shifts were given

25   newer and safer tools and that plaintiff and his co-workers

1    asked for access to those tools but were denied, and those

2    tools were kept under lock and key.

3            You know, that bears directly on our claims of

4    negligence in the case and the jury is entitled to hear that

5    evidence.  We have cited -- in response to this specific

6    portion of the motion, Number 7, we have cited numerous cases

7    in the brief, including from the Sixth Circuit in Churchwell

8    and Rodriguez that evidence of safer methods of work are

9    admissible in FELA cases because the jury can't evaluate what's

10   reasonably safe in a vacuum and evidence regarding whether

11   safer alternatives were available absolutely bears on whether

12   the work method at issue was actually safe at all.

13           And the Sixth Circuit endorsed that kind of evidence

14   as being absolutely probative on that issue of negligence, and

15   it is a major issue in this case.  The Sixth Circuit says we

16   can put it in, and we plan to do so, your Honor.

17           THE COURT:  Mr. Russell, anything else?

18           MR. RUSSELL:  Well, your Honor, yes.  On the issue of

19   newer and safer tools, there is a problem there because the

20   plaintiff is obligated by safety rule to immediately report

21   workplace hazards and unsafe work conditions and injuries.

22           And Mr. Faford reported on the day of the accident,

23   his accident report, that his accident was not caused by any

24   defective tools or equipment.  That was a theory that somebody

25   came up with much later.  And for that reason, we don't have

1    the wrench or the tool that Mr. Faford was using.  He told us

2    that wasn't the cause of his injury and nobody kept it.  So

3    we don't have that tool to compare with any other tools.  So

4    it's a problem for that reason as well.  But if all we're

5    talking about is tools, maybe we can address that when -- with

6    Number 9.

7          THE COURT:  This Item 7 in the motions seeks to

8    include a rather broad range of evidence, and that is, whether

9    or not safer alternatives existed.  The Churchwell case

10   specifically says, and I'm quoting, "Proof that a safer

11   alternative existed makes it more probable that a defendant

12   failed to exercise reasonable care in establishing a safe

13   workplace."

14          Now, Churchwell was a Jones Act case, but the

15   principles apply equally, with equal force, in a FELA case.

16          There is the Rodriguez case.  Judge Murphy, in our

17   Court, denied an identical argument that Grand Trunk raised

18   back in 2009.

19          It is relevant that safer alternatives existed.

20   We will talk about that specific tool in a moment.

21          The Johnson case, as I mentioned before, does not

22   support the plaintiff's argument, and the other cases that were

23   cited primarily were -- by the defendant were from the Seventh,

24   Fifth, and Fourth Circuits.  The Fifth Circuit has spoken on

25   this.  So with respect, that aspect of the motion is denied.

1          Next, the defendant seeks to exclude evidence of a

2    lack of formal investigation or discipline concerning whether

3    the plaintiff violated any safety or operating rules.

4          So go ahead with that, Mr. Russell.

5          MR. RUSSELL:  Sure, your Honor.

6          This motion is another example of Mr. Faford's kind of

7    ever-changing story about how his accident happened.  His tools

8    on the day of the accident, like I just mentioned, he reported

9    his tools were not unsafe.  There is no mention of the stairs

10   shifting.  No attempting to muscle it, the bolt, that is, on

11   the angle cock, after moderate effort was used, all things that

12   he said in his deposition for the first time.

13         So under the collective bargaining agreement that

14   governs Mr. Faford's relationship with Grand Trunk, Grand Trunk

15   is afforded discretion as to whether or not it conducts a

16   formal investigation once an incident occurs.

17         If it does nowadays, it does so at its own peril,

18   because railroad employees who report unsafe work conditions

19   where investigations are conducted are afforded

20   whistleblower -- afforded whistleblower status and can sue the

21   railroad for a whistleblower claim.

22         So Grand Trunk supported that discretion.  It does not

23   assess discipline in every case or for every incident, and so

24   the evidence about whether or not a formal investigation

25   occurred is completely irrelevant.

1          The case that the plaintiff cites, the Panger case,

2     there was a formal investigation.  The railroad exercised its

3     discretion, conducted a formal investigation, which absolved

4     the plaintiff of fault.  The railroad took the position, after

5     an investigation, the plaintiff was not at fault.  And then

6     it said that the evidence should admissible because the

7     railroad took an inconsistent position at trial.

8          Here there is no position taken.  GTW acted within its

9     discretion based on the information the plaintiff reported on

10    the day of the accident, which has changed now.  He has told

11    a different story in his deposition and has made several

12    admissions which we believe constitute contributory negligence.

13         But the evidence that we did not exercise our

14    discretion to conduct a formal investigation does not make it

15    more or less probable that plaintiff was negligent or anything

16    else.

17         And also, if they had conducted a formal investigation

18    we contend that's a subsequent remedial measure.  So we believe

19    the evidence that there was no investigation conducted is not

20    probative and ought to be excluded.

21         THE COURT:  Mr. Wilensky?

22         MR. WILENSKY:  Yes, your Honor.

23         I think the key point from our perspective about

24    what Mr. Russell said is that the defendant exercised its

25    discretion not to charge him under these circumstances.

Motion Hearing - April 12, 2021

```
 1              And here at trial they plan to put on testimony and
 2      evidence that in the railroad's view the plaintiff was
 3      comparatively negligent by violating a slew of safety rules.
 4              We think that it's extremely relevant and probative,
 5      then, that the railroad did not charge plaintiff with any rule
 6      violations or discipline him for those alleged violations that
 7      it now says that he committed.
 8              You know, I think that the defendant's arguments, at
 9      best, are explanations for why it didn't charge him and factual
10      disputes on those matters, and they can present those issues
11      to the jury.  It doesn't make their decision not to impose
12      discipline any less relevant.
13              We do rely on the Panger case.  It says that it's --
14      that this kind of evidence is admissible because it gives rise
15      to an inference that the actual facts are inconsistent with
16      what the defendant now claims at trial.
17              I don't think that there is anything in the Panger
18      decision that holds that the holding of that case turned on the
19      fact that there was an acquittal at the investigation hearing.
20      There is nothing of that sort in that case.
21              And the Hval case from Oregon State Court, which we
22      also cited in our brief, specifically held that evidence of a
23      lack of discipline is admissible to rebut a comparative
24      negligence charge by the defendant.  You know, there's no --
25      all of the -- all of the issues that are identified --
```

1            THE COURT:  In Hval, wasn't the evidence,

2    Mr. Wilensky, that someone else was charged with the violation

3    and not the plaintiff?

4            MR. WILENSKY:  No.  They disciplined Hval's co-workers

5    and not Mr. Hval, and later on they tried to put those rule

6    violations on Mr. Hval at the -- at trial.  And the Court --

7    and the Court, the Appellate Court affirmed, I believe, the

8    Trial Court's determination that the fact that he wasn't

9    disciplined, that he wasn't disciplined by the railroad and

10   that others were, was admissible as contradicting the

11   railroad's claims at trial.

12           THE COURT:  All right.  Anything else, Mr. Wilensky?

13           MR. WILENSKY:  It's very probative, in our view.

14           I'm sorry.

15           THE COURT:  I apologize.

16           Anything else, is what I was asking.  Any further

17   argument?

18           MR. WILENSKY:  I don't think so, your Honor.

19           THE COURT:  All right.  Anything else, Mr. Russell?

20           MR. RUSSELL:  No, your Honor.  I would just mention

21   that the things the railroad is saying that Mr. Faford did

22   unsafe that constitutes contributory negligence were not

23   reported to the railroad by Mr. Faford on the day of the

24   accident.  There's no way they could have investigated, so --

25   or charged him with a rule violation, which they didn't know

1    he had committed until he said so in his deposition many years

2    later, and it was too late at that point.

3              THE COURT:  Well, this is kind of interesting.  The

4    defendant wants to offer evidence that the plaintiff violated

5    safety rules by not reporting the causes of his injury, also by

6    not refusing work which he believed could be unsafe, and also

7    by -- that is, invoking the empowerment rule, and because of

8    that he was comparatively negligent.

9              Whether the defendant accused, either before or

10   after -- - I guess after -- and disciplined Faford for

11   violating those rules becomes relevant, and that's really what

12   the Panger case, which was an Eighth Circuit case, stood for,

13   in addition to the State Court case from Oregon and the Smith

14   case that the plaintiff cited.

15             The undisputed fact is that Grand Trunk never did

16   investigate or discipline Faford for any alleged violation of

17   safety rules and that could be considered inconsistent with its

18   responsibility and with its assertion of his responsibility and

19   it would be admissible for that purpose.

20             Grand Trunk urges the Court to exclude reference about

21   its failure to discipline Faford for three reasons, so let's

22   look at those.

23             First, it contends that it does not and cannot assess

24   discipline for every violation of its operating rules, and

25   therefore, it is a discretionary decision not to investigate

1   Faford, and therefore, that discretionary decision is

2   irrelevant.

3          But I find that that doesn't really stand up to

4   the logic behind the argument.  If Grand Trunk has the

5   discretion not to investigate employees, that implies that it

6   affirmatively chose not to investigate and discipline Faford,

7   and that contradicts its position that he violated, in any

8   material way, its operating rules.

9          Grand Trunk also maintains that the railroad -- the

10  Railway Labor Act and the collective bargaining agreement

11  between Grand Trunk and the plaintiff's union govern the

12  assessment of discipline against an employee, and therefore, it

13  suggests that the Court has, quote, "no jurisdiction," close

14  quote, in this area and that the National Railroad Adjustment

15  Board is the exclusive forum for dealing with that.

16         But nobody is challenging Grand Trunk's decision not

17  to investigate Faford.  Instead, Faford is simply arguing that

18  the lack of invest -- of an investigation ought to be able to

19  rebut the defendant's argument that he violated the rules.

20         The second point is that the post-incident personnel

21  action is inadmissible as a subsequent remedial measure and

22  admitting it would violate Rule 407.  But that argument is off.

23  The failure to do anything does not constitute and cannot

24  constitute a subsequent remedial measure.  In fact, the

25  point of Rule 407 is to encourage parties to take steps in

1    furtherance of added safety.  So the defendant cannot benefit

2    from the rule when it failed to fulfill its own purpose.

3              Finally, the defendant argues that this line of

4    argument is substantially more prejudicial than probative.  I

5    don't find that it is.  There is nothing conscience shocking

6    about the evidence of failure to discipline, and so I'm going

7    to deny that aspect of the motion.

8              On to Item Number 9, and that was teed up before, and

9    that is whether or not there is evidence that there were better

10   tools available to Faford who was using old and worn-out

11   tools ought to be excluded because, as I understand it, the

12   evidentiary hook that the defendant relies on is relevance and

13   balancing under Rule 403.

14             So why don't you proceed with that, Mr. Russell?

15             MR. RUSSELL:  Thank you, your Honor.

16             In terms of relevance, newer and safer alternatives is

17   not the relevant inquiry under the FELA.  It's whether the tool

18   at issue was reasonably safe and whether the workplace was

19   reasonably safe.

20             This whole issue about the tools, the wrench, the

21   wrench slipping, this all came up much, much later when --

22   after this lawsuit was filed.  Mr. Faford reported to the

23   railroad on the day of the accident that his tools were not

24   defective and did not cause the incident, and so we have no

25   way of -- that tool was not, you know, preserved as evidence

1   like it would if it was an object that someone was claiming

2   caused an injury.

3       Mr. Faford reported, "I was using the wrench and I

4   felt pain in my back."  Didn't say anything about it slipping

5   off the bolt or that he felt the tool was old, worn out,

6   anything like that.  And so the first time we heard about it in

7   this lawsuit was now all of a sudden the tool is defective and

8   that there were these other tools, again, not really identified

9   that other shifts had that were safer.

10      And so not only is it not relevant, but given what the

11  plaintiff reported, he shouldn't even be allowed to argue that

12  the tool was defective, because what he reported, as he was

13  obligated by the safety rules, was that the tool was not

14  defective, and that report prejudiced the defendant.  So for

15  that reason as well we would ask it to be excluded under 403.

16      THE COURT:  So you're arguing that because the

17  plaintiff reported that the tool was not defective he should

18  not now be able to argue that it was and that there were better

19  tools available?

20      MR. RUSSELL:  Yes, your Honor.

21      THE COURT:  Okay.  Mr. Wilensky?

22      MR. WILENSKY:  Well, your Honor, I do think that he --

23  my recollection of the incident report, which admittedly I

24  don't have in front of me right now, but I do think that he

25  said in the incident report that his wrench slipped.  I'm not

1    going to go back over the argument that I made a moment ago

2    about newer and safer methods.  I think the Court has already

3    ruled on that.

4         The evidence -- the argument put forward by the

5    defendant here, I think, goes to cross examination it may take

6    of Mr. Faford.  It doesn't -- it may provide a basis for cross

7    examination.  It doesn't provide a basis for exclusion.  The

8    elements for estoppel certainly aren't met here in terms of

9    what happened before and it's not fully briefed regardless.

10         You know, he has -- the claim in this case is

11    certainly that the tools that he was provided with were

12    inadequate, they were old and worn out, and three of his

13    co-workers have testified that this was a recurring issue

14    that they repeatedly brought to the attention of Grand Trunk

15    supervisors, and they were rebuffed every time.

16         That's very relevant evidence.  It is evidence of

17    safer alternative, which is permitted under the Sixth Circuit

18    cases we discussed previously.  And it's -- you know, it's at

19    the crux of the plaintiff's negligence case for the first

20    injury where we -- you know, that's the allegation, that he

21    was provided with unsafe tools, and this goes to the heart of

22    that.

23         So I don't think that the defendant has provided a

24    basis for excluding this evidence, your Honor, and we would

25    ask that this portion of the motion be denied.

```
 1          THE COURT:  All right.  Anything else, Mr. Russell?

 2          MR. RUSSELL:  No, your Honor.

 3          THE COURT:  Okay.  I agree, the evidence is relevant.

 4   There is no basis to estop the plaintiff from asserting that

 5   position.  There is plenty of information available to the

 6   defendant for cross examination and to provide an explanation;

 7   in fact, a rather stark explanation to the jury as to why that

 8   tool isn't available for them to evaluate on their own, but

 9   that all goes to weight and not admissibility.

10          Item Number 10 has to do with excluding testimony that

11   the plaintiff's preexisting back injuries were caused by any

12   duties that Grand Trunk imposed upon Faford before the two

13   incidents in this case, and I thought we had crossed this

14   bridge earlier before that the defendant did not -- I'm

15   sorry -- the plaintiff did not intend to make any argument to

16   that effect.

17          In fact, I think the plaintiff's position is that

18   there was no preexisting injury to be aggravated to begin with.

19   So I'm not sure -- well, maybe out of an abundance of caution,

20   that's why the defendant offered that, but is that pretty much

21   your position on that, Mr. Russell?

22          MR. RUSSELL:  Yes, your Honor.  And my understanding

23   was this item was conceded by the plaintiff.

24          THE COURT:  Yeah, I think so too, Mr. Wilensky.  Do

25   you agree?
```

Motion Hearing - April 12, 2021

1      MR. WILENSKY:  Your Honor, we are not going to argue
2   that the defendant was responsible for plaintiff's physical
3   condition before the first injury alleged.
4      THE COURT:  All right.  I'm going to grant the motion.
5   If something should come up that somehow changes that position
6   then the defendant -- the plaintiff must seek permission of the
7   Court to address something along these lines before it does so
8   and must seek that permission outside the jury's presence.
9      Item Number 10 has to do with testimony about Barry
10  Hammock's conduct after Faford reported the January injury, and
11  I'm not sure the basis.
12      Is it relevance that you're arguing on this,
13  Mr. Russell?
14      MR. RUSSELL:  Yes, your Honor.  There's several bases
15  here, but relevance is the main thing; that, you know, there is
16  no claim in this case that Mr. Faford did not receive proper
17  medical attention or that his injuries were somehow worsened by
18  some late reporting.
19      But the main thing is, your Honor, this is going to
20  create an irrelevant sideshow, a trial within this trial about
21  this long history with Mr. Hammock.
22      Mr. Hammock used to be a car inspector with Mr. Faford
23  and his three co-workers who are expected to testify at trial,
24  and there was no supervisor for the midnight shift, which is
25  the shift that they regularly worked.

1          Others, including some of Mr. Faford's co-workers,

2     interviewed for this job.  Ultimately, Mr. Hammock was selected

3     and became the supervisor.  Before that, Mr. Faford was the

4     senior car inspector in the Flat Rock shop and he was the

5     one that was tasked with the supervisory responsibilities,

6     informing the men of their work duties, holding the job safety

7     briefing.  And I think there was some bad blood there when

8     Mr. Hammock got this job.

9          And what happened in this case, your Honor, is when

10    the co-workers, Mr. Johnson, Mr. Sennett and Mr. Schurig were

11    deposed, and Mr. Faford, they all launched into this attack on

12    Mr. Faford -- I mean -- on Mr. Hammock, because he allegedly --

13    when Mr. Faford reported his first incident, they claim he

14    laughed him off and walked away.

15         Now, Mr. Hammock, who has also been deposed, disputes

16    that.  And there was a subsequent investigation of Mr. Hammock.

17    He was ultimately exonerated by the company and found that he

18    did nothing wrong.  But they claim he was walked off the

19    property and subsequently fired from his position as a

20    management employee.

21         And all of this has nothing to do with Mr. Faford's

22    incident.  It's going to require us to call additional

23    witnesses.  We will have to call Brian Willis, who was

24    Mr. Hammock's supervisor, to explain that he was exonerated.

25    It's going to -- and so it's just a complete sideshow and it's

Motion Hearing - April 12, 2021

1    an attempt to -- for the plaintiff to pick out a villain for

2    the railroad that they can come in and demonize for irrelevant

3    conduct that had nothing to do with this incident, so they can

4    try to make the jury mad at the railroad because Mr. Hammock

5    did something, you know, egregious like laughing in someone's

6    face when they reported an injury, and that has no relevance.

7            To the extent that there was a subsequent

8    investigation of Mr. Hammock, it's a subsequent remedial

9    measure.  And then if they are trying to say that Mr. Hammock

10   was a bad supervisor and did bad things before this accident,

11   had certain personality traits, that's improper character

12   evidence.

13           So for all those reasons, this evidence about

14   Mr. Hammock, this post-incident conduct, is irrelevant and

15   ought to be excluded.

16           THE COURT:  Well, looking at your motion and hearing

17   your argument, I'm hearing some attempts to broaden the

18   category of evidence you want to exclude, and what I mean is,

19   it sounds as if first you're focusing on whether or not the

20   evidence of Hammond's conduct on the day of the accident should

21   be excluded, but then I hear that you're saying that evidence

22   about Hammond getting -- or Hammock getting walked off the job,

23   that there was disciplinary proceedings that ended up in his

24   favor and so forth, should be excluded as well.

25           Are you talking about everything there?  Because I'm

1  not sure that the plaintiff intends to offer any evidence of

2  the latter category.

3       MR. RUSSELL:  Well, I just want to be clear about

4  that, because they have elicited that testimony from

5  co-workers.  Mr. Faford has testified to it in his deposition.

6  The fact that Mr. Faford -- I mean, Mr. Hammock, whether or

7  not he got walked off the property -- which he didn't, by the

8  way -- is completely irrelevant to Mr. Faford.

9       THE COURT:  Okay.  Mr. Russell, what did the plaintiff

10  tell you that he intended to offer?

11       MR. RUSSELL:  Well, he intends to offer that he, first

12  of all, reported the incident; that Mr. Hammock laughed him

13  off and walked away.  They have said in their pleadings that

14  this is all relevant to Mr. Hammock's overall character.

15       THE COURT:  No, no, no.  Forget the pleadings.  You

16  had a pre-motion conference, I presume, because you represented

17  you did, in which you discussed the nature of the motion and

18  the evidence that you wanted to exclude.

19       What did he tell you he was going to offer?

20       MR. RUSSELL:  Well, the evidence that Mr. Hammock

21  laughed him off and walked away.

22       THE COURT:  That's it?

23       MR. RUSSELL:  Yes.  And then also -- although, also,

24  that he was subsequently investigated and walked off the

25  property.

1          THE COURT:  Oh, okay.

2          MR. RUSSELL:  I think they're going to offer all

3    those.

4          THE COURT:  So you believe the plaintiff is going to

5    offer all of that, then?

6          MR. RUSSELL:  I think so.

7          THE COURT:  All right.  Mr. Wilensky?

8          MR. WILENSKY:  I think we are, your Honor, to be

9    clear.  And you know, your Honor, Mr. Russell's argument, he

10   chalks this up to a vendetta on the part of plaintiff and his

11   co-workers against Mr. Hammock.  And, you know, to that end,

12   we think that Mr. Hammock is just a bad supervisor, and

13   inadequate supervision is one of our claims of negligence in

14   the complaint in this case.

15          The railroad claims that Mr. Faford failed to properly

16   report his injury in this case and that his -- you know, any

17   failure in that regard casts doubt on whether he was actually

18   injured.

19          In light of that claim by the railroad, the testimony

20   about -- from Mr. Faford and from his co-workers, which we have

21   cited in the brief, that testimony about when he tried to --

22   when Mr. Faford tried to report his injury to Mr. Hammock,

23   he was ignored and then he was laughed at, it's absolutely

24   relevant because it shows, first, that he tried to report

25   his injury; and second, it provides an explanation for any

68

 1    deficiencies in the report because he was ignored and then

 2    blown off, essentially, under egregious circumstances by his

 3    supervisor.

 4            THE COURT:  Yeah, but what about any subsequent action

 5    by the railroad against Hammock?

 6            MR. WILENSKY:  Well, I think that that's -- I think

 7    that that goes hand in hand about what we talked about earlier

 8    in terms of the investigation.  You know, the defendant --

 9            THE COURT:  What investigation?

10            MR. WILENSKY:  The investigation -- the part of the

11    motion that we discussed a little bit earlier about how

12    Mr. Faford was never investigated or was never disciplined as

13    a result of this.  This is the other side of the same coin, I

14    think, your Honor.

15            The defendant, in Mr. Hammock's deposition -- and they

16    noticed and took his deposition in this case, this was not our

17    dep, so it was on direct on their part, they -- they took

18    testimony of him that -- where, you know, he said that he did

19    everything by the book; that he offered the plaintiff medical

20    care or anything else that he needed as a -- you know, after

21    he was injured here, and that's absolutely rebutted.

22            The subsequent treatment of -- and the fact that

23    Mr. Hammock was walked off the property, as confirmed by

24    Mr. Faford's co-workers, regardless of what the railroad now

25    claims, that's relevant to rebut his testimony that he did

1    everything by the book and he offered plaintiff medical care

2    and did this the right way.

3         And it's also relevant to the claim of negligent

4    supervision that his -- that the plaintiff's supervisor was

5    taken off the property as a result of this exact incident, and

6    the fact that he was then demoted from the supervisory ranks

7    back down to the rank and file.

8         All of that is relevant, your Honor.  Again, I think

9    that what the defendant has offered here are a number of, you

10   know, alternate arguments that it can make at trial to try and

11   minimize the weight of this evidence, but I don't think that

12   that affects its admissibility.

13        THE COURT:  Mr. Russell?

14        MR. RUSSELL:  Well, your Honor, I think Mr. Wilensky

15   just confirmed that this -- that they do intend to offer that

16   Mr. Faford -- I mean, excuse me -- Mr. Hammock was a -- what he

17   described as a bad supervisor and must have acted in conformity

18   therewith on the day of the accident.  That is classic

19   character evidence.

20        The evidence of the subsequent investigation to

21   which -- which exonerated Mr. Hammock has no relevancy.  And to

22   the extent it does, it's a subsequent remedial measure.  And

23   the only way it would be relevant if, in fact, Mr. Hammock --

24        THE COURT:  Tell me how it's a subsequent remedial

25   measure if he was investigated and exonerated.  I mean, I could

1    see how it would be a subsequent remedial measure if he was

2    investigated and fired.

3           MR. RUSSELL:  Our position is, the subsequent

4    investigation is a remedial measure that the railroad can

5    undertake and evidence of it should not be allowed.  I

6    understand that he was not fired or anything like that, but

7    the investigation itself.

8           And, of course, it has no relevance to the incident.

9    And the only way this could be relevant is if Mr. Faford --

10   there's some FELA cases where a railroad employee alleges he

11   did not receive prompt medical treatment, like, for instance,

12   he reported chest pain and laughed him off and later had a

13   heart attack, that might be relevant.  But here, none of this

14   has any relevancy.  It's -- like I said, it's going to create

15   a sideshow, a trial within a trial, and none of it has any

16   relevance to the issues in the case.

17          THE COURT:  The evidence, as I see it, of plaintiff's

18   reporting the injury and Hammock's reaction to it on the date

19   of the event is relevant to show that Mr. Faford was injured

20   at the time, that he attempted to report his injury as required

21   by Grand Trunk's rules, work rules, and that potentially

22   Grand Trunk provided negligent supervision based upon Hammock's

23   conduct.

24          Anything that happened afterward, that Hammock

25   was walked off the property, that there was a subsequent

1    investigation, that Hammock was exonerated, I don't see that

2    that has any bearing to show that a fact of consequence to the

3    determination of this action was more or less likely, and it

4    is collateral to the issues in the case.

5         So I'm going to deny the motion with respect to

6    exclusion of evidence of Hammock's conduct on the day of the

7    incidents -- incident in relation to the plaintiff and his

8    reporting and grant the motion concerning subsequent items of

9    evidence that I just mentioned.

10        Item Number 12 has to do with any reference to

11   Grand Trunk as the Canadian National Railway, and for the life

12   of me I can't figure out what the problem is with that.  There

13   are several witnesses and documents that refer to CN as the

14   defendant's parent company.  I don't see how that would provide

15   any confusion.  It would probably provide clarity.  And I

16   don't see any prejudice that could result from identifying

17   Grand Trunk as a subsidiary of a Canadian company.

18        Mr. Russell, what's the problem here?

19        MR. RUSSELL:  Well, your Honor, the problem here is

20   that, first of all, Canadian National Railway is a separate

21   entity who is not a party to the action.

22        The defendant is Grand Trunk Western who does business

23   under a logo, CN, as does a number of -- as do a number of

24   other railroads in the United States that are also subsidiaries

25   of the parent company, Canadian National Railway.

1         But my concern here is that, you know, the plaintiff

2    is going to say, well, this isn't really Grand Trunk, this is

3    the big bad foreign Canadian Railroad, Canadian National

4    Railway, and that's just not true.  That is the parent company.

5         The defendant in this case is Grand Trunk.  I'm

6    concerned about an argument of that nature.  And quite frankly,

7    it's not relevant.  Canadian National Railway is not a party.

8    The fact that CN appears on -- Canadian National appears on

9    certain documents in the case should not allow the plaintiff

10   to refer to the defendant as Canadian National Railway.

11        And I usually handle this in opening statement.  I

12   explain to the jury that my client is Grand Trunk Western.

13   Sometimes you see the logo, it's a logo, Canadian National,

14   that's a logo they do business under, but don't get confused.

15        But the fact of Canadian National Railway, a separate

16   parent entity, I don't think is relevant and the potential for

17   prejudice is there if the plaintiff makes that argument.

18        THE COURT:  Have you tried Grand Trunk cases here in

19   this District before?

20        MR. RUSSELL:  Not yet, your Honor.  This will probably

21   be my first one.

22        THE COURT:  Okay.  Mr. Wilensky, do you have any

23   argument?

24        MR. WILENSKY:  Your Honor, I just think that based on

25   the unprompted deposition testimony of the three witnesses that

1    we cited, this is relevant because it's what it is known by

2    as -- known by by its employees and anecdotally by the public.

3    I don't think that any prejudice has been shown.  And quite

4    honestly, living in this area for a long time, I don't think

5    that there's any prejudice against Canada in general.  So I

6    think --

7         THE COURT:  Well, you know, I was about to make that

8    observation, that I could see if the plaintiff filed this

9    motion there might be something to it, because people in

10   Michigan, especially southeast Michigan, love Canadians.  I

11   think the feeling is mutual.  There is so much pre-pandemic

12   reciprocal trade and travel that the people of Windsor and

13   Canada are thought almost to be pseudo-citizens of the country.

14   I don't see any prejudice and I don't see any confusion.

15        I will step in, of course, if the plaintiff makes an

16   argument about the resources of Canadian National Railway or

17   that that position has anything to do with liability in the

18   case, but other than that, the notion is denied.

19        The next point is that the defendant seeks to preclude

20   evidence about loss of consortium or injury suffered by family.

21   I think that point is conceded.  I don't think the plaintiff

22   intends to offer any evidence in that regard.  We have talked

23   about it before.

24        Mr. Wilensky, are we clear on this point?

25        MR. WILENSKY:  Correct, your Honor.

Motion Hearing - April 12, 2021                                      74

1          THE COURT:  Okay.  That aspect of the motion is

2    granted.

3          Item 15 has to do with item -- evidence that Brian

4    Weaver was not able to investigate the scene of the accident,

5    when he apparently did his investigation based upon facsimiles

6    or specimens that were similar in all material respects to the

7    railroad car in issue.

8          I don't think the plaintiff intends to make a point of

9    that; is that correct, Mr. Wilensky?

10         MR. WILENSKY:  Correct, your Honor.

11         THE COURT:  All right.  That part of the motion is

12   granted.

13         Next has to do with any argument or evidence that the

14   plaintiff's job tasks were tiring, exhausting, repetitive or

15   strenuous because, as I understand it, the defendant makes the

16   point that this is not a repetitive work injury or cumulative

17   trauma-type claim.

18         I'm not sure why that means that evidence should not

19   be admissible, though, Mr. Russell.  Can you explain that,

20   please?

21         MR. RUSSELL:  Sure, your Honor.

22         My concern is if this evidence is allowed and it's not

23   a cumulative trauma claim, but the jury might infer that the

24   plaintiff's back in the condition that it was on the day of the

25   accident -- and keep in mind our position is that, you know,

1    he had these preexisting injuries -- was due to, you know,

2    strenuous and repetitive job tasks, and which is contrary to

3    what the plaintiff's interrogatory answers say in this case.

4              THE COURT:  Yeah, but why should that mean that the

5    plaintiff can't tell the jury what his job consisted of?

6              MR. RUSSELL:  Well, if it -- my concern is, if they

7    are going to make the argument that the job was tiring or

8    strenuous, it bleeds over into the realm of cumulative trauma,

9    which is not at issue in this case.

10             THE COURT:  Well, wouldn't that explain why he can't

11   return to work?

12             MR. RUSSELL:  It could, but the -- you know, it's got

13   to be specifically tied to specific job tasks that he can't

14   perform, specific job functions, like he has a 15-pound lifting

15   restriction that prevents him from coming back.

16             THE COURT:  All right.  I --

17             MR. RUSSELL:  But any argument --

18             THE COURT:  I'm sorry, go ahead.

19             MR. RUSSELL:  I'm done, your Honor.

20             THE COURT:  I see your point, Mr. Russell.  I'm --

21   I don't believe that the argument supports excluding this

22   evidence.  If the plaintiff attempts to change theories to

23   allege a cumulative trauma or repetitive work injury, of

24   course, I will prevent the plaintiff from doing that.  Other

25   than that, though, that aspect of the motion is denied.

1          We have, let's see, four other motions, I think each

2     addressing discrete items of evidence.

3          Before we get to those, Rene, do you want a break or

4     are you okay?

5        (Discussion held off the record.)

6          THE COURT:  All right.  We will continue then.

7          The next is Item 112 having to do with the golden rule

8     argument, or, as the defendant identifies it, the reptile

9     theory argument, which is interesting.

10         I have to confess I am quite familiar with the golden

11    rule argument.  I am not familiar with the reptile theory, but

12    I have been educated by the defendant's motion here.  And we --

13    I can assuredly -- I can assure all of you that there will be

14    no dinosaurs, lizards, or snakes allowed in the courtroom or

15    any references to them, particularly snakes.

16         But the golden rule argument is precluded.  I don't

17    think that the plaintiff intends to offer that argument at all.

18    To that extent, the motion is granted.

19         I'm not sure about what you want to say about the

20    reptile theory, Mr. Russell, but go ahead with that, please.

21         MR. RUSSELL:  Sure, your Honor.

22         THE COURT:  Just make sure -- just make sure it's not

23    a cold-blooded argument.

24         MR. RUSSELL:  I won't, your Honor.

25         As you picked up in our briefing, your Honor, the

Motion Hearing - April 12, 2021

 1  reptile theory is something that's -- you know, we're seeing

 2  more and more of these days, and it's an alternate version of

 3  the golden rule argument.  And --

 4          THE COURT:  Is this this conscience of the community

 5  type thing that you're worried about?

 6          MR. RUSSELL:  Yes.  Yes, your Honor.  That's on page 4

 7  of the plaintiff's brief.  They specifically say the jury is

 8  entitled to consider whether a litigant needlessly endangered

 9  the public.

10          And what happens is, the juror hears that evidence and

11  says, well, I'm a member of the public, you know.  And it's

12  just another way -- I'm a member of the community.  I don't

13  want to be needlessly endangered.  And whether or not Grand

14  Trunk's conduct needlessly endangered the public is completely

15  irrelevant, and any questions along that line or invoking

16  exactly what we're trying to prevent, is the jury putting

17  themselves in the plaintiff's position.

18          And so that -- that's -- that's what this motion is

19  about.  I think your Honor has -- you know, understands it

20  well.

21          THE COURT:  Well enough, I guess.

22          Mr. Wilensky?

23          MR. PEARLMAN:  Your Honor, excuse me.  I have got

24  Number 2, 4, and 5.

25          THE COURT:  Oh, I'm sorry, Mr. Pearlman.  Go ahead

1   with that.

2         MR. PEARLMAN:  Well, first of all, yes, I don't think

3   there is a question regarding the golden rule.

4         Second of all, I promise I won't call the railroad a

5   reptile.  I don't know much about the reptile theory, so I am

6   not sure what Mr. Russell wants me not to say.  I thought in

7   reading his reply that basically we would take that up during

8   the trial if I overstep my bounds.  But I don't think this is

9   an issue -- going to be an issue.

10        THE COURT:  Well, let me just address this,

11  Mr. Pearlman.

12        Mr. Russell, I appreciate the thought behind this

13  motion as sensitizing the Court to the argument, and it serves

14  useful purpose in that regard.  I think that what you're trying

15  to prevent preemptively here is a little bit too vague for me

16  to give you an argument about it.

17        I'm going to deny the motion without prejudice and

18  leave it to contemporaneous objections.  You have briefed it,

19  I understand your position, and I think it's more prudent to

20  raise it in that regard, with all due respect.

21        MR. RUSSELL:  Thank you, your Honor.

22        MR. PEARLMAN:  Thank you, your Honor.  Mr. Wilensky --

23        THE COURT:  Next is -- I'm sorry?

24        MR. PEARLMAN:  Mr. Wilensky will do the third one and

25  I'll do four and five, Judge.

```
 1          THE COURT:  This is Docket Number 113.  It has to do
 2   with the defendant's argument about precluding evidence
 3   primarily, I think, from the plaintiff's expert concerning the
 4   calculation of damages.  The calculation of damages usually
 5   follows a four-step process, but damages, strictly speaking, I
 6   guess, broadly speaking, concerning lost wages are not limited
 7   to mere wage loss but rather loss of earning capacity.  I don't
 8   think there is a dispute about that.
 9          The four-step process, however, calls for -- step two,
10   in any event, calls for calculation of a lost income stream,
11   and the loss of wages is a pertinent measure of the loss of
12   income stream, and so that's why, I guess, wage loss is
13   important and evidence bearing on that is important, but the
14   estimated loss of work life, the calculation of the lost income
15   stream, the computation of total lost income, and then a
16   discount to present value is the four-step process identified
17   by the parties here.
18          And so I think the argument really sort of gets into
19   the weeds about how wage loss -- the wage loss component
20   should be calculated.  So I'll let you take it from there,
21   Mr. Russell, if you please.
22          MR. RUSSELL:  I believe Ms. O'Donnell is handling this
23   one.
24          THE COURT:  Oh, okay.  Ms. O'Donnell.
25          MR. RUSSELL:  And I'll mute.
```

1    MS. O'DONNELL:  Thank you, your Honor.  Thank you,

2  Mr. Russell.

3    Yes, your Honor.  As you pointed out in your

4  introductory remarks, it's a four-step process, as we set

5  forth in our motion citing to the Culver case out of the

6  Fifth Circuit.

7    And the difficulty here is that the plaintiff mixes up

8  loss of earning capacity and the loss of wages.  The point is

9  that the starting point of the four steps is to determine the

10  base annual income at the time of the injury, and that's based

11  on United States Supreme Court case of J&L.

12    But here, plaintiff's second alleged injury is 8/3/18;

13  the first is 1/3/17.  He did not have a full year in either

14  '17 or '18; so, therefore, we need to annualize his earnings.

15    Plaintiff, on the other hand, wants to use a method

16  that's not been adopted by any court, and that is the use of

17  cohorts.  But as I said, it's not allowed by any precedent,

18  and we have information as to Mr. Faford's income for his last

19  complete year from which we can annualize his earnings.

20    And then, secondly, as to the second step, the Supreme

21  Court said in Liepelt, we must use after-tax income.  It's the

22  only realistic measure.

23    Similarly, the Supreme Court said the same in the

24  J&L case; therefore, the measure of damages in this FELA case

25  is lost income after deducting for federal and state taxes and

1    Tier 1 and Tier 2 RRTA taxes.

2          So, therefore, Mr. -- Dr. Thomson, his report has

3    got some errors in it with regard to these steps.

4          Now, the plaintiff cites to the cohorts, which is not

5    allowed under any precedent.  And they cite to this Taenzler

6    case, which is misplaced because they talk about future trends.

7    And Dr. Thomson has no basis for the -- comparing Mr. Faford

8    with cohorts because he can't differentiate between them.

9    There is not enough information.

10          And the plaintiff says, well, this whole calculation

11    of the tier -- deducting for Tier 1 and Tier 2 RRTA taxes is

12    too complex.

13          To the contrary, the United States Supreme Court said

14    in Liepelt, a jury can compute this.  It is not too complex.

15    So to address the concern that Mr. -- the plaintiff raised

16    about double taxation, this can be addressed by the jury with a

17    proper instruction.  The economists and the jurors must deduct

18    RRTA taxes above the wage caps when calculating lost wages.

19          Then we get into the last corollary of the four steps,

20    which is unreimbursed business expenses.  When calculating

21    lost wages, Mr. Faford's lost wages, based on Mr. Faford, not

22    on others, his economist must deduct from his income stream

23    business expenses he would have incurred were he still at the

24    railroad; e.g., safety shoes, union dues, and share of health

25    insurance, if any.

Motion Hearing - April 12, 2021

```
 1          So Dr. Thomson, we had his deposition scheduled
 2   for April 20th; however, I just got an email on Friday from
 3   Mr. Wilensky telling me that Dr. Thomson's deposition cannot
 4   go forward on the 20th.
 5          Many of these issues, your Honor, we will flesh out at
 6   his deposition, but according to Mr. Wilensky's Friday email,
 7   we cannot take his deposition until the end of April or the
 8   beginning of May.
 9          As far as the component regarding loss of fringe
10   benefits, plaintiff is totally wrong in his response about
11   plaintiff being off insurance as of 2022, and Dr. Thomson
12   made that same error in his report.  Mr. Faford is still an
13   employee.  And on the one hand, Dr. Thomson says he is going to
14   go off in 2022 and on the other hand he says he is still going
15   to be on.  As I said, we will have to flesh that out in his
16   deposition when that occurs.
17          But the point is, his calculation must reflect the
18   reality that Mr. Faford has been covered for health insurance
19   for 2017, 2018, 2019, 2020, and 2021, et cetera.
20          And then last, mitigation.  Dr. Thomson -- and
21   again, this is something we'll take up at his deposition --
22   Dr. Thomson stayed at the number of 30,000, which is the number
23   that Mr. Faford is currently making.  I'll find out at his
24   deposition, apparently he was not told that the plaintiff's
25   supervisor said the plaintiff could earn more at his new job
```

1        than he did at the railroad.

2              Mr. Faford has a co-worker who has been there only two

3        years who is already making twice what Mr. Faford is currently

4        making. A second employee is making six figures. And the

5        supervisor said if Mr. Faford works hard and is motivated, he

6        can make six figures. Dr. Thomson did not take that into

7        account.

8              Again, these are issues we will raise at the

9        deposition and will be more extant, if you will, after we have

10       taken the dep and see if Dr. Thomson backs off some of these

11       errors regarding the RR -- the Railroad Retirement Tier 1 and

12       Tier 2 taxes, if he backs off the cohort, and if he backs off

13       his mitigation calculation.

14             And so, your Honor, I ask that until we depose

15       Dr. Thomson and we see where he stands, we already know that

16       as far as our Motion in Limine Number 5 regarding loss of

17       household services that another court has stricken his opinion

18       in that regard as being lacking in -- totally lacking in

19       foundation, so we will have to see whether any other of

20       Dr. Thomson's other opinions, when fleshed out at his

21       deposition, are also lacking in foundation, as I believe

22       the cohort analysis is.

23             So, your Honor, I ask that at this point we hold this

24       motion in abeyance until we're permitted to take Dr. Thomson's

25       dep, which the dates keep getting pushed back.

1          Thank you, your Honor, for hearing me out.

2          THE COURT:  So you don't want a ruling on this now?

3          MS. O'DONNELL:  I think it -- I think it's premature

4     at this point, your Honor.  If you have any insight based on

5     your research and the parties' briefs, I think that could be

6     helpful to the parties while deposing Dr. Thomson.  So I'm very

7     open to hearing what, if any, insight you have on these issues.

8          THE COURT:  If I were to rule on this now, what do you

9     want excluded, his whole opinion?

10          MS. O'DONNELL:  Well, that would be interesting.

11          THE COURT:  Well, I'm trying to read that into your

12     motion.  I'm not sure exactly what it is you want excluded

13     based on the motion that you have presented.

14          MS. O'DONNELL:  Well, he has to deal with the Railroad

15     Retirement Tier 1 and Tier 2 taxes properly, and so far he

16     hasn't done that properly.

17          Secondly, his use of cohorts is without precedent.

18          His loss of fringe benefit calculation is incorrect,

19     and is both incorrect and inconsistent, totally inconsistent,

20     and his mitigation is boneheaded and not based on the testimony

21     we obtained from his supervisor.

22          So frankly, frankly, given the fact that his opinions

23     are not based on facts, I think all of his opinions should be

24     stricken.  They are inconsistent, they are unsupported, and

25     just like in the case that we cited in our fifth motion in

1    limine, his opinion should be stricken.

2          THE COURT:  All right.  Based upon what I have heard,

3    I don't think it's prudent to rule on the motion at this point.

4    And the tenor of the motion really is not a motion in limine

5    at all.  It sounds like it's a Daubert motion, which really is

6    not an issue; that is, the admissibility of the expert opinion

7    under Rule 702 is not a proper issue to be raised via a motion

8    in limine.

9          I think probably the most prudent thing to do under

10   the circumstances, then, is to deny the motion without

11   prejudice, and if you think that there is a basis to renew

12   this motion or file a different one, if it's within the

13   confines of the scheduling order after you take the witness's

14   deposition, that's the route you should take.

15         So Docket Number 115 -- I'm sorry -- 113 is denied

16   without prejudice.

17         The next motion is Docket Number 114, which is a

18   motion to exclude -- no, I'm sorry -- it's a motion with

19   respect to the consequences of the plaintiff's failure to make

20   certain disclosures about his medical treatment when he worked

21   at Ford Motor Company, and it appears that the defendant is

22   asking the Court to make certain fact findings about the fact

23   that Faford had a preexisting back injury while he was working

24   at Ford or incurred there; that all of Faford's injuries are

25   attributable to his previous existing condition, and

1    instructing the jury with respect to certain information

2    concerning his previous injuries and treatment, precluding him

3    from offering evidence that he sustained an aggravation of a

4    preexisting condition, although that's not really on the table

5    anymore anyway, and precluding him offering any rebuttal

6    evidence.  I think that's really what this motion seeks to do.

7              Who -- which one of you is taking this argument?

8              MS. O'DONNELL:  I believe Mr. Pearlman said he is

9    arguing the fourth.

10             THE COURT:  No, no, this is a defense motion.

11   Which --

12             MS. O'DONNELL:  Yes, I know, your Honor.  I'm arguing

13   it on behalf of the defendant.

14             THE COURT:  That's what I'm asking.  So go ahead.

15             MS. O'DONNELL:  All right, your Honor.

16             We are asking, based on your order compelling

17   plaintiff to cooperate in discovery and based on his gross and

18   flagrant violation of that order that the Court advise the

19   jury, not as a fact finding, I think your Honor errs there,

20   we're not asking for a fact finding, rather, a direction that

21   it's accepted as fact that plaintiff had preexisting back

22   injuries, conditions, disorders, or syndromes.

23             THE COURT:  How's that different than a fact finding?

24             MS. O'DONNELL:  No, your Honor, because it is an

25   established fact.  It's like directing the jury that the sun

1  comes up in the morning.  You direct the jury that he had a

2  series of back injuries prior to coming to the railroad.

3        And that as the second point in our motion, that you

4  direct the jury that if it be accepted as fact that these

5  alleged injuries are attributable to his preexisting conditions

6  in an amount to be determined by the jury.

7        In other words, ladies and gentlemen of the jury, it's

8  a fact that he had these preexisting injuries.  He is claiming

9  he injured his back in this case.  We're asking you to

10  determine what percentage is due to preexisting injuries.

11        Third, instruct the jury that plaintiff failed to

12  comply with this Court's order that he disclose his medical

13  treaters dating back to 1995; that he failed to comply with a

14  court order by serving a verified list of treaters that didn't

15  include the medical treatment that he received while working

16  at Ford.

17        Tell the jury that plaintiff served a false answer

18  to Grand Trunk's Interrogatory Number 4 by failing to disclose

19  the prior medical treatment he received for his back at Ford.

20        And last, your Honor, direct the jury -- instruct the

21  jury, that plaintiff lied under oath at his deposition when he

22  testified that he never sustained any workplace injuries to his

23  back.

24        Then we ask that plaintiff be precluded from offering

25  any evidence that what happened to him at work aggravated his

 1  preexisting conditions because --

 2          THE COURT:  That's not even on the table anymore,

 3  Ms. O'Donnell.  They don't intend to make that argument.

 4          MS. O'DONNELL:  Well, I heard you say that, your

 5  Honor, that it's not on the table.  I have not heard

 6  Mr. Pearlman or Mr. Wilensky say that they are not going to

 7  make that argument.

 8          THE COURT:  Well then you haven't been listening.

 9          MS. O'DONNELL:  All right.  Well, could we get that

10  on the record from one of the attorneys?

11          THE COURT:  I think it already is.

12          Any further argument?

13          MS. O'DONNELL:  Yes, your Honor.

14          We want to preclude the plaintiff from offering any

15  evidence as to Items 1 through 4 in our motion and from

16  offering any reason or excuse for why he failed to comply with

17  your Honor's order.

18          And then last, to preclude plaintiff from arguing that

19  he was an egg-shell plaintiff or a thin-skulled plaintiff, as

20  those terms have been defined in the law.

21          In other words, you can't be an egg-shell plaintiff if

22  there are no eggs.  And here, since he failed to disclose his

23  preexisting condition, he can't be an egg-shell plaintiff.  So

24  we ask the Court to preclude plaintiff from arguing that.  And

25  I don't know, and perhaps I wasn't listening, whether that's

1     off the table.

2            But we do know that point 5 of our Motion in Limine

3     Number 4 that plaintiff claims, "Oh, the reason why I didn't

4     comply with the court order by telling Grand Trunk about all

5     my prior treatment while I was at Ford for ten years, a dozen

6     injuries to his back, the reason why I didn't do that is

7     because it was minor, and the reason I didn't do that is

8     because I just went to my cupboard.  It's like going into my

9     cupboard and take an aspirin.  These were just nurses."

10           Well, your Honor's order says that -- compelled

11    plaintiff to produce a sworn list of his lifetime medical

12    providers, and in that order you said, your Honor, the

13    plaintiff was to furnish to counsel for the defendant, under

14    oath, a list of all medical providers with whom he has

15    consulted in any way from 1995 through the present day.

16           Plaintiff wholly failed to identify any of the medical

17    providers with whom he consulted in any way.  It's shocking to

18    me.  It's sickening to me.  You have an order from a federal

19    judge that tells you to tell the other side who you have

20    treated with, consulted in any way.  Your Honor's language

21    was very broad and yet specific, "consulted."

22           If you look at Exhibit 3, your Honor, and I augmented

23    it this morning -- and I apologize, I augmented it this morning

24    with records that were inadvertently not included in the

25    initial filing back in March.

1           But Exhibit 3, Page ID 2172, 8/31/06, that's the date,

2     August 31, 2006, a doctor said that he, Mr. Faford, could

3     return to work after having muscle spasm and strain.  A doctor

4     told him that.  Mr. Faford didn't tell us about that.

5           10/22/04, Page ID 2173, a doctor notes that

6     plaintiff's last day of work was 10/08/04 and he couldn't go

7     back to work until 10/25/04.  What is that?  That's two weeks

8     off of work.  Why?  For a sprain in his neck, back, shoulder,

9     and wrist.

10          And yet Mr. Faford says, "Oh, these were such minor

11    aches and pain, I don't think I missed any time from work."

12    Well, look at 2173.

13          THE COURT:  Ms. O'Donnell, you're getting pretty far

14    off your five-minute mark here.  Why don't you sum up, please?

15          MS. O'DONNELL:  Thank you, your Honor.  I appreciate

16    the warning.

17          The point is, the plaintiff's excuse that they were

18    minor, that there was no diagnoses, that, "Oh, they were just

19    nurses," as if nurses aren't medical personnel who were

20    consulted is really a disgusting failure to comply with a

21    federal court order.

22          This case and this status does rise to the level of

23    where this case could be dismissed with prejudice for the

24    failure to deny.  The plaintiff says, "Oh, well, there's --

25    it's a no harm, no foul, because you got all the records,

1    Grand Trunk."

2          Well, yeah, we got all the records because after

3    writing to Ford three times, we then had to subpoena Ford, we

4    finally got the records.  But Rule 37 has no requirement for

5    prejudice.

6          But then perhaps the cherry on the top of this

7    disgusting concoction is plaintiff, at his deposition, even

8    though we, of course, produced all these records to plaintiff

9    counsel who presumably shared them -- and that's Exhibit 7,

10   Page ID 2193, where there is an email from Wise Carter to

11   plaintiff giving them all the Ford Motor Company records --

12   even though plaintiff had those records, and then at his

13   deposition he was asked:  "Other than your neck and midback

14   have you ever sustained any workplace injury to your lower

15   back?"

16          "No," plaintiff testified.

17          Under oath, lied, page 2196, Page ID.

18          Your Honor, this case should be dismissed with

19   prejudice; however, we're asking for the less drastic sanction

20   as outlined in our motion, to tell the jury he had these

21   preexisting injuries, let them determine in what amount.

22          Tell the jury that he failed to comply by telling

23   Grand Trunk about this, and he gave a false answer in his --

24   to Number 4, and then lied at his deposition when he said he

25   never sustained any workplace injury to his back.

1          THE COURT:  All right.  Thank you, Ms. O'Donnell.

2          Mr. Pearlman, are you taking this argument?

3          You're muted, Mr. Pearlman.

4          MR. PEARLMAN:  I apologize.

5          THE COURT:  All right.  This is an argument -- I'm

6    sorry -- a motion based on Rule 37 that the Court ought to

7    impose sanctions short of dismissal for your client's failure

8    to comply with an order to produce.  Go ahead and address that

9    argument, please.

10         MR. PEARLMAN:  Yes, your Honor.  I understand the rule

11   that this motion is brought under.  I think that the remedy

12   that the defendant is asking for is drastic.  I think that

13   Mr. Faford at all times, in good faith, attempted to respond

14   to the Court's order, furnish as many medical providers as he

15   could remember.

16         He did, in fact, file an affidavit which was five

17   pages which went back, pursuant to your direction, to 1999.

18   The issue I -- as I see it, it's that we're centering on the

19   Ford Motor Company records, and not 12, as Ms. O'Donnell

20   stated, but there are 10 events, not all of them are related to

21   the back, asking Mr. Faford to remember that in 1996 he went to

22   first aid, got an aspirin or an Ibuprofen for pain in his back

23   and went back to work.

24         Mr. Faford just did not remember those events as being

25   medical treatment, as being injuries; however, the defense has

1    made it very clear that they think that this is an intentional

2    act on Mr. Faford's part to deceive the railroad, which doesn't

3    make a lot of sense inasmuch as he advised them that he worked

4    at Ford Motor Company.  He signed an authorization for them to

5    get the Ford Motor Company records.  The Ford Motor Company

6    records were obtained by the railroad, in an email to us, I

7    think, on February 4 or 5, 2020.  He was deposed on July 15,

8    July 16, 2020.  They had those records for five months.

9           If you look at the plaintiff's efforts over the course

10   of this lawsuit, he has given them everything they have asked.

11   He has given them photographs, credit records, financial

12   records, medical records.  He has signed every authorization

13   that they have requested.

14          There is no intent on Mr. Faford's part to deceive.

15   If he didn't remember those events from Ford Motor Company --

16   by the way, he did recall the shoulder incident that

17   Ms. O'Donnell talked about which happened to be an off-duty

18   injury playing with his kids.

19          So we think that the remedy asked for is so extreme

20   that there is not, in our opinion, any intent to deceive.  If

21   he wanted to deceive, Ford Motor Company might not -- never

22   have been mentioned by him.  An authorization to get those

23   records would never be forthcoming.

24          And the defendant takes the position that he believed

25   that he would give those records up in the way he did, but that

 1    the railroad wouldn't see those records or see those visits to

 2    the first aid.

 3            Keep in mind also, Judge, that from 2007 until 2017,

 4    Mr. Faford had no problems with his back, no medical treatment,

 5    no indication that he was having any problems working.  He

 6    worked several jobs before he went to work at the railroad.

 7    He worked at the railroad from 2010 until 2017.

 8            So specifically the relief that the railroad is asking

 9    for in 1, 2, 3, 4, 5, and 6 of their motion, we believe, should

10    be denied.  These are fact questions.  To tell the jury that

11    he had a preexisting back injury based on those records at Ford

12    Motor Company is a stretch.  The fact that some nurse made an

13    entry of a back pain, and again, there is -- Mr. Faford -- and

14    our position is that there was no preexisting injury.

15            Although I would like to clarify, Judge, after

16    January 13, 2017, we have never -- the issue that the Court

17    ruled on regarding preexisting injuries were prior to the

18    January 3rd, 2017, accident.  There may be testimony that there

19    was an aggravation of that injury on the January 3rd, 2017,

20    injury, but nothing prior to that, because our position is,

21    when he got hurt in January of 2017, he had no preexisting

22    condition.

23            THE COURT:  You mean to say that you intend to argue

24    that the August 2018 injury when he rolled his ankle might have

25    aggravated his back injury from January?

```
 1            MR. PEARLMAN:  Our expert may make reference to that,
 2    yes, sir.
 3            THE COURT:  Will he or not?
 4            MR. PEARLMAN:  Well, you know what, I'm trying to
 5    remember.
 6            THE COURT:  It's either your position in the case that
 7    he had a back injury caused by the employer's negligence back
 8    in January of 2017 and that a subsequent event in August of
 9    2018 caused it to get worse or -- I mean, there is either
10    testimony on that or not.  Your client really should have been
11    able to explain that by now.
12            MR. PEARLMAN:  Well, the client --
13            THE COURT:  Shouldn't be a mystery in the case.
14            MR. PEARLMAN:  Oh, I'm sorry, Judge.  Are you done?
15    I don't want to cut you off.
16            Mr. Faford testified that he went back to work after
17    the January incident and he was doing well and that the August
18    accident, his back never got better.
19            Dr. Newman -- you got me -- I need to confer with
20    Mr. Wilensky on this.
21            MR. WILENSKY:  May I?
22            MR. PEARLMAN:  Can he jump in?
23            THE COURT:  Mr. Wilensky, what's the defendant's --
24    the plaintiff's position on that?
25            MR. WILENSKY:  Yes, your Honor.  Dr. Newman, who is
```

Motion Hearing - April 12, 2021                    96

1    our neurology -- neurology expert on this and is going to

2    be testifying for the plaintiff, he did testify that he had

3    work-related injuries beginning on January 3, 2017, and

4    additional injuries aggravating that which occurred in

5    August 2018, and that's stated in his report of May 19 of

6    last year.  So that is certainly part of the case.

7              THE COURT:  All right.  But it's not part of --

8              MR. WILENSKY:  The application of --

9              THE COURT:  But it's not part of the case that he is

10   an eggshell-skull plaintiff and you're not going to argue that

11   the railroad has to take him as they find him; right?

12             MR. WILENSKY:  Well --

13             MR. PEARLMAN:  Okay, Ben, I'll jump in.

14             MR. WILENSKY:  Okay.

15             MR. PEARLMAN:  Judge, I think that that is a

16   legitimate position for the plaintiff to take, that the

17   railroad takes the plaintiff as he finds him.

18             THE COURT:  Well, that's the law, Mr. Pearlman, but

19   that depends on how you're going to make that argument.  If

20   you're going to say that he is vulnerable because he had this

21   history of back problems which he didn't disclose to begin

22   with, I don't know that that's something that is fair game

23   here.

24             MR. PEARLMAN:  Well, we're not taking the position

25   that the back events that happened in the '90s and in the early

1    2000s are what was aggravated.  We don't take that position

2    that those were back injuries.  Those were events, and we will

3    deal with that as it comes.

4         We are taking the position that when he got hurt in

5    January and returned, and Dr. Newman has made it clear, that

6    the second injury was an aggravation of maybe what was already

7    there from January, not from 1996.

8         We're not going to argue an eggshell.  I'm not --

9    you're not going to hear that come from us, all right?  But you

10   will hear Dr. Newman's testimony that the second incident of

11   August is an aggravation of that injury, that original injury.

12        THE COURT:  Yeah.  All right.  Anything else on your

13   argument, Mr. Pearlman?

14        MR. PEARLMAN:  Yeah.  I just -- you know, I urge the

15   Court, Mr. Faford has done everything he can to comply.  He is

16   not -- if his memory is not good, it is not a reflection on his

17   intention to disobey this Court's order.  I think he did --

18   everything we asked him to do, he did.  Everything that defense

19   has asked for, we have complied with.

20        And I know that prejudice is not part of Rule 37, but

21   this is -- this is not a -- they had the records.  They knew

22   the records.  They never even asked or showed Mr. Faford the

23   records to see if they could refresh his memory.  They just

24   chose to ask him about it and that was it.

25        I think -- I think these are very extreme sanctions

Motion Hearing - April 12, 2021

98

1    that they are asking for.  I think 1 through 6 should be

2    denied.

3              THE COURT:  All right.  Go ahead, Ms. O'Donnell.  Any

4    rebuttal?

5              MS. O'DONNELL:  Your Honor, Mr. Pearlman cut you off

6    at some point.  You were saying something that I wanted to

7    hear.  Do you know remember what that was?

8              THE COURT:  No.

9              MS. O'DONNELL:  Okay.  If this were Jeopardy or

10   we were siting around playing poker, I would say, "Is it a

11   coincidence that the injuries Mr. Faford doesn't remember are

12   his back injuries, and in this case, he is claiming a back

13   injury which totally disables him and he wants several million

14   dollars for his total disability?"  I would say that with some

15   sarcasm.

16             But this, this is a serious situation where a

17   plaintiff comes into federal court, has eminent counsel, files

18   a complaint alleging negligence against his prior employer who

19   continues to carry him on his health insurance, and then serves

20   an answer to interrogatory that's false.  And then we have to

21   file a motion to compel and the Court has to get involved and

22   specifically says, "Tell them" -- "You must list all medical

23   providers with whom you have consulted in any way."

24             And what's his response?  "Oh, it was a nurse."

25   That's so denigrating to nurses.

1          But that is also beside the point, because we had

2     doctors in Exhibit 3, and including that which I augmented this

3     morning, Page ID 2894, 2895, doctors, 2893, who took him off

4     work because of his back injuries.  And yes, it's true, I said

5     12 over the course of 10 years and it was 10.  I'm sorry,

6     unlike Mr. Faford, I wasn't taken off work.  If I were taken

7     off work, I would remember, because of my back strain, sprain,

8     spasms.  And it's on page 6 of our brief, Page ID 2159, and he

9     doesn't remember one of these 10, not one.

10         And then when asked a very specific, direct question

11    by Mr. Russell, Exhibit 8 to Motion in Limine 114, Page ID

12    2196:  "And other than your neck and midback, have you ever

13    sustained any workplace injury to your lower back?"

14         "No."

15         Mr. Pearlman very cleverly calls them "events," but

16    the doctors and the nurses called them lumbosacral sprain and

17    strain repeatedly, low back pain, diagnosed with low back

18    disorder pain syndrome.  You get a diagnosis like that and you,

19    quote, "forget," and your attorney calls it an event, when

20    you're suing for a back injury and you have a federal judge

21    telling you to list all your treaters and you don't.

22         Mr. Pearlman says that's an extreme sanction.  No.

23    Rule 37 says when you don't obey a District Court order,

24    Roman Numeral V, dismissing the action in whole or in part.

25         Two, prohibiting the disobedient party from supporting

1    or opposing --

2              THE COURT:  Don't read me the rule, Ms. O'Donnell.

3    Do you have any rebuttal argument?

4              MS. O'DONNELL:  I am continuing with my rebuttal

5    argument, your Honor.

6              I believe that that which Mr. Russell and I are asking

7    is reasonable with and consistent with what I just read,

8    your Honor, Roman Numeral V under 37(b)(2), that he should be

9    precluded from saying, "I didn't know," that this was just an

10   event.  He should be precluded because of his disobedience of

11   a federal court order.

12             And because of the seriousness of this, your Honor,

13   may I consult with Mr. Russell and inquire whether he has

14   anything to inject into these proceedings?  May I, your Honor?

15             THE COURT:  No.  You have made your argument.  You

16   have divided up this allocation of duties concerning the

17   motions, the several motions that have been presented.

18             MS. O'DONNELL:  That's fine, your Honor.

19             THE COURT:  Just tell me what it is you want

20   Mr. Faford to be precluded from doing.

21             MS. O'DONNELL:  I want to preclude him from making

22   any excuse for his failure to comply with a court order; to

23   preclude him from making any excuse for why he lied at his

24   deposition and why he served a false answer to an

25   interrogatory; preclude him from giving these lame excuses

1    that, "I forgot, it was like going to my cabinet and getting

2    aspirin"; and that I ask that you instruct the jury that the

3    plaintiff is not permitted to make these instructions -- these

4    excuses -- excuse me -- but plaintiff is precluded from making

5    these excuses because he failed to comply with a court order by

6    failing to serve Grand Trunk, whom he has sued, with a verified

7    list of treaters; and that he served a false answer and he lied

8    under -- at his deposition.

9           And that is why he is going to be excluded, ladies

10   and gentlemen of the jury, from making these excuses, and that

11   we're doing this short of dismissing his case.  That's how

12   serious it is when you lie at your deposition and you don't

13   comply with a federal court order.

14          Thank you, your Honor.

15          THE COURT:  All right.  Rule 37 permits the Court to

16   impose various sanctions in the event that a party fails to

17   comply with an order to produce evidence.

18          Mr. Faford was instructed to give a list of treaters,

19   I believe, from 1995 forward.  He did not disclose any medical

20   treatment that he received while he was working at Ford Motor

21   Company, and some of that treatment had to do with complaints

22   of back pain, also had to do with complaints of shoulder pain,

23   but I don't know that there is much to the case about that.

24          The requests that the defendant makes in terms of

25   preclusion require me to make a finding of credibility where

1    the plaintiff has offered explanations for why he did not

2    recall.  I suppose those explanations could be called into

3    question given the gravity of the ailments that the medical

4    records disclose, but I decline to make that credibility

5    determination, because that's something that the jury is most

6    capable of doing after hearing the list of medical providers,

7    the contents of those medical records, and Mr. Faford's

8    explanation, which he will be permitted to give.

9         I will, however, provide the defendant an opportunity

10   to tender a jury instruction that explains that the Court

11   entered an order requiring production of a list of medical

12   providers and that the defendant did not identify the providers

13   that rendered medical treatment during that time when he was at

14   Ford Motor Company, and that whether or not he was deceptive in

15   making nondisclosure is an issue that the jury can take into

16   account in determining his overall credibility.

17        Beyond that, the motion is denied in all other

18   respects.

19        Next we have item -- Docket Number 116.  That has to

20   do with whether or not the plaintiff's expert, Dr. Thomson, can

21   testify that the loss of value of household services can be

22   fixed at $25 per hour.  I believe that the defendant -- I mean

23   the plaintiff -- excuse me -- has conceded that Dr. Thomson

24   does not intend to give any testimony to that effect and he

25   will not take that position at trial.

1           Whose is this; Mr. Pearlman or Mr. Wilensky?

2           Mr. Pearlman, if it's yours, you are muted.  You'll

3   have to unmute.

4           MR. PEARLMAN:  Thank you, Judge.  Yes, I've got it.

5           And you're correct, we're not making a claim for

6   lost household services.  Dr. Thomson will not be asked any

7   questions regarding value thereof.

8           THE COURT:  Okay.  And in that case, then, the motion

9   will be granted and Dr. Thomson will not be able to give

10  testimony regarding the loss of household services or valuation

11  of that.

12          I don't think that there are any other motions in

13  limine.

14          There is a motion to adjourn the trial.  The trial has

15  been adjourned.

16          We also have a final pretrial conference that is up to

17  today.  I'm not going to conduct that, due to the length of

18  time we have spent on the motion arguments.

19          We do have a Zoom jury trial that is underway right

20  now with Judge Goldsmith.  I am going to reserve the right to

21  the determine whether we will proceed in that fashion after

22  I see the results of Judge Goldsmith's trial and I'm able to

23  assess the utility of proceeding in that way.

24          If I determine that it is useful and that this case

25  is an adequate candidate for that, I will hear arguments on

```
 1    the defendant's motion to continue the trial, which is
 2    Docket Number 104, in which the defendant challenges the
 3    constitutionality of being able to proceed in the manner that
 4    I had suggested.
 5          If I do intend to proceed that way, I will provide
 6    some background information and some documentation as to how we
 7    will proceed with a checklist and an opportunity for training,
 8    but I will not conduct a final pretrial conference until that
 9    date is determined and we can proceed from there.
10          So unless there is anything further from the plaintiff
11    or the defendant, we will adjourn the proceedings today.
12          Mr. Pearlman, is there anything further from the
13    plaintiff?
14          MR. PEARLMAN:  I have just one question, Judge.  You
15    may not be able to answer it.
16          Can you give us any time frame as to when you will
17    analyze this remote trial and make a decision?
18          THE COURT:  Well, I mean, you have some depositions
19    you have to take anyway, so it probably won't be before the end
20    of the month, I can tell you that.  I will give you advanced
21    notice and work around your schedules, of course, to plan, in
22    the event we go forward.  And although, given the reports of
23    the proliferation of the COVID infections in the state and the
24    spiking numbers, I think it might be a little bit Pollyannaish
25    to suggest that it might be a moot point because we could
```

```
 1   convene in person, but nonetheless, I continue to hold out hope

 2   that this second-best alternative of remote proceedings can be

 3   discarded in favor of an in-person trial.  So we will just

 4   continue to make those observations.

 5            MR. PEARLMAN:  Thank you, Judge.

 6            THE COURT:  I'm sorry, Mr. Pearlman, I can't be more

 7   specific than that.

 8            MR. PEARLMAN:  No, I appreciate the issue.

 9            THE COURT:  Mr. Russell, anything further from the

10   defendant today?

11            MR. RUSSELL:  Nothing further, your Honor.  Thank you.

12            THE COURT:  All right.  Thank you.  I hope you all

13   stay well.  Court is in recess.

14            MS. O'DONNELL:  I'm sorry, your Honor.  Your Honor,

15   I'm sorry.

16            THE COURT:  Yes, Ms. O'Donnell?

17            MS. O'DONNELL:  Thank you.

18            When you were addressing Grand Trunk's fourth motion

19   in limine, you said that the defendant can submit a court --

20   a jury instruction talking about the court order.  Then I --

21   I wrote down that you said, "The plaintiff did not provide,"

22   and I assume you meant -- I'm sorry -- you said, "The defendant

23   did not provide," and I'm sure you meant "The plaintiff did not

24   provide," but I wanted the record clear.

25            THE COURT:  Yeah.  When I say "provide information,"
```

1    I was referring to the plaintiff's failure to provide

2    information about his medical treaters.

3            MS. O'DONNELL:  Thank you.

4            And then the second point I wanted to make, your

5    Honor, is that Mr. Russell and I are in the middle of taking

6    the trial deposition which was started by Mr. Pearlman of

7    Mr. Faford's treater, and we did not get to our cross

8    examination.  And the first date that the doctor could offer

9    us was June 21st at noon for Dr. Islam, is her name, for us to

10   continue to take her evidence deposition.  So that date is

11   still out there.  Of course, that was the soonest dated she

12   would give us -- she could give us.

13           THE COURT:  Mr. Pearlman, she is going to have to do

14   better than that, and if so, I'll order her to be present.  But

15   that deposition, that trial deposition is going to have to be

16   completed probably this month or at least in the first week of

17   May.  Other than that, she may not be able to be used as a

18   witness.  So you're going to have to get her to cooperate.

19   If you need the Court's assistance, I'll provide it.

20           MR. PEARLMAN:  Well, I'm going to do my best, Judge,

21   although we left an hour and a half on the table because the

22   defendants did not want to start the cross examination, so --

23   and they requested four hours for the examination, and that's

24   the problem in trying to get the time.

25           THE COURT:  You want four hours for a trial

1    deposition, Ms. O'Donnell?

2         MR. PEARLMAN:  That is correct.

3         MS. O'DONNELL:  Well, your Honor, we just wanted to be

4    able to finish our cross examination, and we anticipated that

5    with the objections being interposed by Mr. Pearlman that we

6    would not be able to get done within an hour and a half, so we

7    asked for more time.  Yes, your Honor.

8         MR. PEARLMAN:  Well, they're not going to -- they

9    don't get that many objections on a trial dep from me, Judge,

10   number one.

11        And number two, that's the problem.  This is a very

12   busy doctor at Henry Ford Hospital trying to block off four

13   hours.

14        THE COURT:  How long was your direct?

15        MR. WILENSKY:  50 minutes.

16        MR. PEARLMAN:  Less than an hour.

17        THE COURT:  All right.

18        MR. PEARLMAN:  46 minutes, as I recall.

19        THE COURT:  I would think that -- I would think that

20   two hours of the doctor's time should be sufficient, so make

21   that arrangement.  If it has to be done on a weekend or

22   evening, then so be it.

23        MS. O'DONNELL:  Well, I asked her that, Judge.  Judge,

24   I asked her that, if we could do it on a weekend or in the

25   evening so that we could have time to finish our dep, our

```
 1    cross examination, and she --
 2            THE COURT:  Ms. O'Donnell, you're winning this
 3    argument.
 4            Mr. Pearlman, you're going to have to get her -- get
 5    it finished before June 24, I can guarantee you that.
 6            MR. PEARLMAN:  Okay.  I understand that.  But are you
 7    saying a two-hour time block for her?
 8            THE COURT:  I'm not going to limit her to two hours,
 9    but two hours ought to be sufficient if you're dealing with a
10    doctor's schedule.
11            MR. PEARLMAN:  Okay.
12            THE COURT:  All right.  Thank you.
13            MR. WILENSKY:  Your Honor, may I ask a question?  You
14    mentioned that Judge Goldsmith has a virtual trial going on
15    right now.  Do you know whether the Court's office or Judge
16    Goldsmith's chambers came up with virtual trial protocols that
17    we might be able to see so we can prepare if that eventuality
18    happens in our case?
19            THE COURT:  Yeah, I think he did, and if we happen to
20    go forward in that vein, I will make them available to you.
21            MR. WILENSKY:  Okay.  Thank you.
22            THE COURT:  All right.  Thank you.
23            MS. O'DONNELL:  Our clients were -- and may still
24    be -- I don't see their names here.
25            Your Honor, will Ms. Pinkowski reschedule the final
```

1   pretrial conference?

2            THE COURT:  Yeah.  I told you we will reschedule all

3   of those things after -- once we establish a trial date.

4            MS. O'DONNELL:  Okay.  Thank you, your Honor.

5            MR. PEARLMAN:  Is somebody going to tell our clients

6   that they can leave?  I  don't know how --

7            THE COURT:  I'll leave that to you.

8            MR. PEARLMAN:  Well, I don't know how to get ahold of

9   them.

10           THE CLERK:  This is Susan.  I'll open up the meeting

11  and see if anybody is in there and let them know.

12           MR. PEARLMAN:  Thank you, Susan.

13           THE CLERK:  But I can't do that until this ends.

14           MS. O'DONNELL:  Thank you, Ms. Pinkowski.

15           THE COURT:  All right.  Court is in recess.

16                (Proceedings adjourned at 1:04 p.m.)

17                     *        *        *

18

19                 CERTIFICATE OF COURT REPORTER

20

21       I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23

24  _____      April 29, 2021
        s/ Rene L. Twedt
    RENE L. TWEDT, CSR-2907, RDR, CRR, CRC        Date
25      Federal Official Court Reporter